[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-15001
_____

D.C. Docket No. 3:08-cv-00316-RH

JOHNNY SHANE KORMONDY,

Plaintiff-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Defendant-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(July 31, 2012)

Before TJOFLAT, HULL, and WILSON, Circuit Judges.

TJOFLAT, Circuit Judge:

Johnny Shane Kormondy, a Florida death row inmate convicted of murder,

appeals the decision of the United States District Court for the Northern District of

Florida denying his petition for a writ of habeas corpus. Two state court trial proceedings were before the District Court when it ruled. The first proceeding was the guilt phase of Kormondy's bifurcated trial in July 1994.[1] The second proceeding was the penalty phase of Kormondy's trial held in May 1999. The District Court denied the writ with respect to both phases of the trial. After briefing and oral argument, we affirm the District Court's decision.[2]

## I.

On July 11, 1993, Gary McAdams was murdered in his Pensacola, Florida residence. Sixteen days later, an Escambia County grand jury indicted three men for the murder, Johnny Shane Kormondy, Curtis Buffkin, and James Hazen.[3] The

---

[1] The penalty phase of that trial, which resulted in a death sentence, was not before the court because the Florida Supreme Court vacated the sentence and remanded the case for retrial of the penalty phase.

[2] We affirm the District Court's adjudication of three constitutional claims. Two were certified for appeal by the District Court and one by this court. See 28 U.S.C. § 2253(c). The three claims are discussed in parts IV and V, infra. We do not consider one claim the District Court certified and one this court certified. The first is a claim that Kormondy's attorney was ineffective because he failed to impeach the victim's wife based on a prior inconsistent statement. That claim was not presented to the Florida Supreme Court or the District Court. The second is not a constitutional claim, but a claim seeking a new trial on newly discovered evidence which purportedly would have shown that Kormondy is "actually innocent" of the death sentence. See 28 USC § 2254(a) (Federal courts "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.").

[3] Count 1 of the indictment charged murder in the first degree in violation of Fla. Stat. § 782.04.

2

State sought the death penalty against all three because the murder had occurred while they were burglarizing the McAdams residence, committing armed robbery, and committing sexual battery on Cecilia McAdams, the victim's wife.[4]

On arraignment in the Escambia County Circuit Court, before Circuit Judge John Kuder, the defendants entered pleas of not guilty and stood trial. Buffkin was tried first. The jury reached a verdict, but before the verdict was published, Buffkin and the State entered into a plea agreement that called for Buffkin to plead guilty to first-degree murder, receive a life sentence, and testify for the State in the cases against Kormondy and Hazen if requested. The Circuit Court approved the agreement, accepted Buffkin's plea of guilty to the murder charge, and discharged the jury. Kormondy's trial followed Buffkin's.

The guilt phase of Kormondy's trial began on July 5, 1994. Russell Edgar, an Assistant State Attorney for the First Judicial Circuit of Florida, represented the State. Antoinette Stitt and Ronald Davis, Assistant Public Defenders for the First Judicial Circuit, represented Kormondy; Stitt handled the guilt phase and Davis handled the penalty phase.

---

[4] Counts 2, 3, and 4 charged sexual battery in violation of Fla. Stat. § 794.011. Count 5 charged battery during a burglary in violation of Fla. Stat. § 810.02. Count 6 charged robbery with a firearm in violation of Fla. Stat. § 812.13.

3

A.

The following facts were established in the guilt phase of the trial during the State's case in chief.

On Saturday, July 10, 1993, Johnny Shane Kormondy, Curtis Buffkin, and James Hazen gathered at Kormondy's residence in Pensacola, Florida. Buffkin, who had recently escaped from prison, was staying with Kormondy and his wife, Valerie. Hazen was in town from Oklahoma.[5] The day before, Hazen and Kormondy had gotten together and had cased a Pensacola subdivision, Thousand Oaks, looking for a home to burglarize. They failed to spot a promising target, but nevertheless decided to case the subdivision again, the next day, with Buffkin.

The three men left the Kormondy residence Saturday evening, July 10, at about 9:00 p.m., in Kormondy's Camaro.[6] They drove around for three hours until, shortly after midnight, they arrived at the Thousand Oaks subdivision. They parked the Camaro there and waited; they were looking for a house that appeared to be occupied. Shortly after 12:30 a.m., now the morning of July 11, Gary and Cecilia McAdams pulled into their garage. The McAdamses were returning from Cecilia's twenty-year high school reunion at a local country club. They left the

---

[5] Hazen's "foster mother" and Kormondy's mother, Elaine Barnett, were sisters.

[6] Before they left, Valerie overheard the men talking. Buffkin said something about robbing a house on Gulf Beach Highway.

4

garage door open (so Gary could take their dog for a short walk), and entered the house through a door in the garage.  At this point, Kormondy and Hazen covered their faces with masks and their hands with socks while Buffkin, who was armed with a .44-caliber pistol,[7] entered the garage and knocked on the McAdamses' door.  The McAdamses hardly had time to take off their shoes before they heard Buffkin's knock.  Gary McAdams asked who was there; Buffkin responded, "It's me."  Unable to recognize the voice, Gary asked again, only to be met with, "It's me."  Assuming that a neighbor was knocking, he opened the door and found Buffkin standing there with a gun.

Buffkin forced his way into the house and ordered the McAdamses to kneel on the kitchen floor with their heads down.  Hazen and Kormondy then entered, and, while Buffkin stood over the McAdamses, they closed the blinds, pulled the telephone cords out of the wall, and began rummaging through the dresser drawers and closets in the master bedroom.  Hazen found a .38-caliber handgun Gary McAdams kept in his dresser, and on returning to the kitchen, rubbed the gun across Cecilia's McAdams's hip.  Hazen then took Mrs. McAdams, at gunpoint, into the master bedroom and the adjoining vanity, where he ordered her to undress, sit on the toilet seat, and perform oral sex.  Mrs. McAdams had difficulty

---

[7] Buffkin had stolen the pistol during a burglary on the night of July 9, 1993.

5

performing.  She "kept gagging and thinking [she] was going to throw up, and he told [her] that if [she] let it come out of [her] mouth one more time, he would shoot [her]."  While this was occurring, Kormondy was standing beside Cecilia's bed going through one of her purses.  He had long "stringy, mousy brown" hair that came to his collarbone.  Kormondy then entered the vanity and raped Mrs. McAdams while Hazen continued to force Mrs. McAdams to engage in oral sex.

When Hazen and Kormondy were finished, they took Cecilia, still naked, to the kitchen and made her kneel down in front of her husband.  They then forced Mr. McAdams, at gunpoint, to drink a beer from the refrigerator and, as he drank the beer, Buffkin said to Mrs. McAdams, "I don't know what the other two did to you, but I think you're going to like what I'm going to do."  With his .44-caliber pistol in hand, he took Cecilia into the bedroom, made her lie down in the vanity area and began to rape her.  Moments later, a loud noise—the sound of gunfire—suddenly emanated from the front of the house, and Mrs. McAdams heard someone call for "Bubba" or "Buff."  Buffkin quickly threw a towel over her face and ran from the bedroom.  As he did, he fired a shot from his .44-caliber pistol.  The bullet went through the bedroom carpet and lodged in the floor beneath.

6

Cecilia McAdams ran to the kitchen.  The intruders were gone, and she found her husband lying on his back and bleeding from the back of his head.  She tried calling 911, but the phone did not work, so she ran out the front door screaming until the neighbors responded.

Gary McAdams died on the kitchen floor from a shot fired from his .38 caliber handgun.  According to the medical examiner, the gun was pressed firmly against his skull when the trigger was pulled.[8]

Kormondy, Buffkin, and Hazen returned to the Kormondy residence.  At 5:00 a.m., Valerie Kormondy awoke, found the three men sitting quietly in the living room, and went back to bed.  At 7:00 a.m., the phone rang, and Valerie answered it.  Kormondy's mother, Elaine Barnett, was calling.  She and Hazen were supposed to go fishing, and she wanted Valerie to drive Hazen to the place where they were to meet.  Valerie awakened Hazen and drove him there in Kormondy's Camaro.  After dropping Hazen off, Valerie returned to her residence.  Before exiting the car, she saw a bag of jewelry in the back seat; it contained items she had not seen before.  On entering the house, she observed Kormondy and

---

[8] The medical examiner so concluded because there were no powder burns on the scalp; the power burns were inside the skull.

7

Buffkin sleeping.  She awakened them and ordered them out of the house.  They left, and she went to her mother's house.

Kormondy went to stay with one of Valerie's cousins, William Long, who was living alone.  Long had been convicted of felony possession of marijuana and placed on probation.  His probation was about to be revoked, however, because he had failed five drug tests.  He was "on the run," lying low.  One night, while at a Junior Food Store buying gas, he and Kormondy saw a bulletin offering a $50,000 reward for the arrest and conviction of the persons involved in the McAdams murder.  Kormondy remarked that "the only way they would catch the guy that shot Mr. McAdams was if they were walking right behind us."  A day or so later, after a night of drinking, Kormondy told Long "how everything took place"—about forcing their way into the McAdamses' residence, the sexual assaults, and "how he shot him in the back of the head."[9]  Long told a friend of his, Chris Robarts, what Kormondy had said, and they decided that Robarts would contact the police and they would split the reward.  Long did not want to get involved because he might be arrested for violating the conditions of his probation.  He was running the risk of an arrest, though, because Robarts would

_____

[9] At Kormondy's trial, Long testified that he smoked fifty dollars worth of crack-cocaine and drank six pitchers of beer prior to Kormondy's revelation that night.

have to tell the police where he got his information. Robarts did, and two homicide investigators from the Escambia County Sheriff's Office, Allen Cotton and Wendell Hall, came to see Long and persuaded him to meet Kormondy under police surveillance.

Kormondy was working at local cabinet shop, and Long suggested that he meet Kormondy there. The inspectors agreed, and on Monday afternoon, July 19, Long entered the cabinet shop wearing a wire; the inspectors filmed the scene from a van across the street. When Kormondy saw Long, he took him aside. Long got straight to the point. He told Kormondy that the police had been to see him about the murder, and he asked Kormondy whether he had told anyone else about "him killing the dude." Kormondy said he did not know what Long was talking about. Long, in response, said that he was leaving town; Kormondy said, "I'm leaving town, too," and jumped in a gray Dodge Ram and took off.

Sheriff's deputies pursued the Dodge Ram and pulled it over. When the deputies exited their vehicles, Kormondy sped off. He soon abandoned his vehicle and continued on foot. A canine unit from the Sheriff's Office located him in a shed in a residential backyard.

Kormondy was the first to be arrested. After he was taken into custody, he was questioned by officers on two occasions, both on July 19. During the first

9

interrogation, which was unrecorded, Kormondy confessed to being present at the scene of the crime, but denied raping Mrs. McAdams or killing Mr. McAdams. Kormondy claimed that Buffkin shot Mr. McAdams. During the second interrogation, which was recorded, Kormondy did not deviate from his previous statement.

The State rested its case on July 7, 1994. Following a brief recess, the Defense rested as well, without putting on any evidence. After deliberating for four hours, the jury returned its verdict, finding Kormondy guilty as charged. The trial then moved to the penalty phase, which began the next day, on July 8.

B.

The penalty phase began with Judge Kuder instructing the jury as to the proceeding that would take place and the jury's function now that the defendant had been found guilty of first-degree murder. The jurors' role would be to render an advisory sentence as to the punishment the court should impose, death or life imprisonment. They were to base their recommendation on the evidence presented during the guilt phase and the evidence the State and the defendant would be presenting relative to the nature of the crime and the character of the defendant. After considering the evidence, they were to determine, first, whether sufficient

10

aggravating circumstances[10] existed that would justify the imposition of the death

_____

[10] The following aggravating circumstances may justify the imposition of the death penalty in Florida:

(a) The capital felony was committed by a person previously convicted of a felony and under sentence of imprisonment or placed on community control or on felony probation.

(b) The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person.

(c) The defendant knowingly created a great risk of death to many persons.

(d) The capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any: robbery; sexual battery; arson; burglary; kidnapping; aircraft piracy; or the unlawful throwing, placing, or discharging of a destructive device or bomb.

(e) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

(f) The capital felony was committed for pecuniary gain.

(g) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.

(h) The capital felony was especially heinous, atrocious, or cruel.

(i) The capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.

(j) The victim of the capital felony was a law enforcement officer engaged in the performance of his or her official duties.

(k) The victim of the capital felony was an elected or appointed public official engaged in the performance of his or her official duties if the motive for the capital felony was related, in whole or in part, to the victim's official capacity.

(*l*) The victim of the capital felony was a person less than 12 years of age.

(m) The victim of the capital felony was particularly vulnerable due to advanced age or disability, or because the defendant stood in a position of familial or custodial authority over the victim.

(n) The capital felony was committed by a criminal gang member . . . .

(*o*) The capital felony was committed by a person designated as a sexual predator . . . or a person previously designated as a sexual predator who had the sexual predator designation removed.

(p) The capital felony was committed by a person subject to an injunction issued pursuant to [Fla. Stat. §] 741.30 or [Fla. Stat. §] 784.046, or a foreign protection order accorded full faith and credit pursuant to [Fla. Stat. §] 741.315, and was committed against the petitioner who obtained the injunction or protection order or any spouse, child, sibling, or parent of the petitioner.

penalty.  If aggravating circumstances were found, they would determine whether

the aggravating circumstances were sufficient to outweigh the mitigating

circumstances,[11] if any, the evidence had shown.[12]

―――――――――――――

Fla. Stat. § 921.141(5).

[11]  The following mitigating circumstances may counsel against the imposition of the death penalty in Florida:

> (a) The defendant has no significant history of prior criminal activity.
> (b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.
> (c) The victim was a participant in the defendant's conduct or consented to the act.
> (d) The defendant was an accomplice in the capital felony committed by another person and his or her participation was relatively minor.
> (e) The defendant acted under extreme duress or under the substantial domination of another person.
> (f) The capacity of the defendant to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired.
> (g) The age of the defendant at the time of the crime.
> (h) The existence of any other factors in the defendant's background that would mitigate against imposition of the death penalty.

Fla. Stat. § 921.141(6).

[12]  Florida Statutes § 921.141(2) provides, in relevant part:

> After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court, based on the following matters:
> > (a) Whether sufficient aggravating circumstances exist as enumerated in subsection (5);
> > (b) Whether sufficient mitigating circumstances exist which outweigh the aggravating circumstances found to exist; and
> > (c) Based on these considerations, whether the defendant should be sentenced to life imprisonment or death.

Fla. Stat. § 91.141(2).  Judge Kuder, in instructing the jury both before and at the close of the penalty phase, informed the jury that it could not recommended a death sentence unless the

The State's case was brief.  Russell Edgar, alluding to the court's instruction, informed the jury that the State's case for a death-penalty recommendation would be based on the evidence presented during the guilt phase of the trial.  With that brief announcement, Edgar rested the State's case.

Ronald Davis, on Kormondy's behalf, told the jury that the Defense's case for a life-imprisonment recommendation would consist of the testimony of nine witnesses.  His strategy was to have three of the witnesses—Kormondy's mother, Elaine Barnett; half sister, Laura Halfacre Hopkins; and half brother, Willis Halfacre—provide the jury with a narrative description of Kormondy's life and the events that influenced the development of his character and personality and, in effect, molded the person who entered the McAdams' residence on July 11, 1993. A fourth witness, Dr. James D. Larson, a psychologist, drawing on their testimony, would describe that person in psychological terms.

Kormondy's life story actually began with Elaine Barnett's story about her life prior to Kormondy's birth because, according to Dr. Larson, what she had

---

aggravating circumstances it found outweighed the mitigating circumstances shown by the evidence.  The parties jointly requested the instruction even though it appears to be contrary to the language of subsection (b) above.  See Rigterink v. State, 66 So. 3d 866, 897 (Fla. 2011) ("Time and again, the [Florida Supreme Court] has 'rejected the argument that the standard penalty phase jury instructions impermissibly shift the burden to the defense to prove that death is not the appropriate sentence.'" (quoting Taylor v. State, 937 So 2d 590, 599 (Fla. 2006)).

13

experienced prior to that event had a profound effect on the person Kormondy eventually became. Davis's questioning of Elaine elicited the following.

She was born in 1946 in Miami, Florida, into a dysfunctional family. Her father was a truck driver and an alcoholic who beat his wife and children, especially on returning from a long road trip. As Elaine got older, her father sexually abused her. The household was in constant turmoil.

In 1961, Elaine, as a fifteen-year-old tenth grader, dropped out of high school and married Bill Halfacre. Halfacre, like Elaine's father, was an alcoholic and physically abusive. She had two children with Halfacre: in 1963, a son named Willis who went by "Bill" and, in 1965, a daughter named Laura. By 1968, Elaine's life with Halfacre had become unbearable, so she divorced him and married Vernon Holderfield, with whom she had become acquainted prior to the divorce. Holderfield, a house painter, likewise was an alcoholic who frequently beat her. The abuse accelerated after Elaine became pregnant with their son, Vernon, and nine months after he was born she left Holderfield to move back in with Halfacre.

This time, Elaine and Halfacre stayed together for about a year. Life was peaceful for a brief spell, but Halfacre soon returned to his old habit of physical abuse. When she could no longer take it, she left Halfacre and returned to

14

Holderfield.  Elaine's second stint with Holderfield lasted less than a year because he beat her, "[drank,] and [ran] around with women."

In 1970, Elaine Barnett, her three children and her younger sister, Sam Castle, moved to Pensacola, Florida, where Castle had a job waiting.  In 1971, Elaine began living with Johnny Frank Kormondy ("Frank"), a long distance truck driver.  She thought he was single, but he wasn't—he had a wife from whom he was separated.  For six months, Elaine, leaving her children behind with her sister Sam, rode with Frank on his long-distance hauls.

On May 20, 1972, Johnny Shane Kormondy ("Kormondy" or "Shane") was born.  By that time, Frank had left the scene.  When Elaine later sued him for child support, he denied that Kormondy was his.  She soon found herself unable to care for Kormondy, so, in early 1973, a sister living in Louisiana took him to live with her.  He stayed with the sister for six months, then returned to live with Elaine.  Meanwhile, Elaine found a substitute for Frank: Mike Wright, an insurance salesman.  He loved his whiskey; as she put it, he was a "person that went from alcohol to religion weekly."  They stayed together for a year; then Wright disappeared.  Shortly thereafter, Elaine married Gary Arant; at age nineteen, he was eight years her junior.  Arant loved alcohol as much as Wright, and, when drunk, he abused Elaine.  The marriage lasted one month and eight days.  The day

15

Arrant left, he was roaring drunk and tried to beat her in front of her children. Elaine defended herself by running at him with a butcher knife.

In the latter part of 1975 or early 1976, Elaine married George Barnett, another alcoholic whom she had met while she and Arant were still together. By this time, Shane had been enrolled in a "Head Start" program. He completed that program in 1976 and, then, in 1977 and 1978, attended pre-kindergarten and kindergarten. He was known to the school authorities and his classmates as Johnny Shane Barnett, although George Barnett had not adopted him.

When Shane finished kindergarten, the Barnetts, having acquired a trailer, moved to Alabama, taking the four children with them. The family lived on public assistance and food stamps. George drank every day, and, as Elaine described it, "went to church 8 days a week." He went from "the deep side of alcohol to the deep side of religion."

One day in 1983, Laura, then eighteen, announced to her mother and George that she was getting married. Later the same day, George told Elaine that he was divorcing her. He stayed until Laura's wedding, then moved in with his brother, who lived a mile or so away in the Alabama countryside. According to Laura, George's departure had a devastating effect on Shane, then eleven years old. As Dr. Larson testified, George, "an alcoholic" and a "very inadequate role model,"

16

was "the first stabilizing influence in [Kormondy's] life." "[T]his surrogate father, this one person who's been stable in his life, this alcoholic person leaves very abruptly." Shane ran away from home to try to live with him, but Elaine found him at George's brother's place and brought him home. As Laura testified, Shane "idolized" George and blamed Elaine for his leaving. "[H]e started rebelling against my mother. My mother couldn't control him. He'd run away. . . . and go find George, and George would tell him to go back home." "He just was uncontrollable then."

In 1984, one of Elaine's sisters, who was living in Oklahoma, told Elaine that she could get a job there. Elaine, acting on the sister's advice, moved to Oklahoma, taking Vernon and Shane with her. They stayed with the sister for two months. After Elaine obtained work, they moved into an apartment. Shortly thereafter, Vernon suffered a cerebral aneurysm, and surgery was performed at a hospital "[100] miles away." Elaine stayed there with him; meanwhile, her next door neighbor took care of Shane.

Elaine, Vernon, and Shane moved back to Pensacola in 1986, and took up residence in Sam Castle's backyard trailer. Shane, now fourteen, attended Ransom Middle School. Vernon needed further brain surgery; it was performed in Gainesville, Florida, where Vernon and Elaine stayed for a month. While they

17

were in Gainesville, Shane stayed with Aunt Sam.  When Elaine and Vernon returned to Pensacola, she and the two boys moved into an apartment for the handicapped, as Vernon was bound to a wheelchair.  They lived on the "SSI check[s]" she received as a result of Vernon's disability.

By 1988, Shane, now sixteen, was a tenth grader at Tate High School.  He dropped out of school before the year ended.  In Elaine's words, he was "doing drugs" and "had friends [she] didn't care for."  And he wound up in juvenile court.  Shane dated Valerie Kay Fletcher while enrolled at Tate.  They were married four years later, in 1992, one week after their son, Devin Shane, was born.

Elaine's daughter, Laura Halfacre Hopkins, and son, Willis Halfacre, augmented Elaine's testimony, focusing on some of the shortcomings of Elaine's parenting.  Laura described the "family situation" when Shane was born.

> We stayed alone.  My mother worked all the time, worked nights bartending.  Bill and I pretty much took care of Vernon . . . .  He's younger than me.  When Shane . . . was born, he went to live with my Aunt Sam for a while.  [Mother] financially . . . . was having a hard time with three kids, so let alone four. . . .  [W]e had to watch out for [ourselves] . . . .  [S]he wasn't able to afford a babysitter . . . , so we stayed in the house . . . when she went to work . . . .  [W]e put ourselves to bed, and when she'd come home . . . when she got off work—she usually worked until closing, about 2:00 or 3:00 in the morning.

18

Laura said that between marriages, her mother had "several boyfriends," who "sometimes . . . [came] to the house." One, Mike Wright, "lived with us for a while."

Willis Halfacre described his mother as having a bad temper depending on "what kind of mood she'd be in." He had seen her "pick up the two smaller children, Vernon and Shane, and literally just shake them, and they'd fall to the ground like a rag doll." He said that he also had a bad temper and that it was "a result of growing up in this household." It had affected his family situation, a reason why he and his wife had separated. He had "been to counseling voluntarily because [he] had some problems going on in the house with [his] wife and physical violence had come into play and . . . [he] felt [he] needed to go see somebody before [he] got too deep."

To assess Kormondy's character and personality, and perhaps find an explanation for the behavior Kormondy exhibited on the night of July 11 and 12, 1993, Dr. Larson gave Kormondy a battery of psychological and intelligence tests; reviewed his elementary school records, juvenile records, arrest records, and the records of his confinement in the Escambia County and Santa Rosa County jails; read depositions of witnesses in the case; and interviewed family members—Elaine, Laura and Willis.

19

According to Larson, the psychological tests results revealed no "serious mental illness," but they did show "addiction" and "a very serious personality disorder[:] . . . mixed personality disorder . . . [, also referred to as] a personality disorder not otherwise specified." Kormondy had "deficits" in relating to "other human beings [and] in [his] ability to control . . . impulses"; he was "very impulsive." The "two major variables associated with [Kormondy's] personality disorder [were his] heredity . . . and environmental experiences," which included, more specifically, his negative "role models," parents' "rejection," and "childhood trauma."

Elaine was at the center of these two major variables, heredity and environmental experience. As Dr. Larson noted, "[h]er father was an alcoholic truck driver and he would go off on long trips [and when] he'd come back, he would . . . beat her mother and sometimes beat her and the other kids." "As she got older, he began sexually abusing her." In Dr. Larson's opinion, Elaine's "psychological history was very important in how she conducted parenting" and, accordingly, in the creation of Kormondy's environmental experience. She came from "a very dysfunctional family" and she "gets involved in marriages where she's abused [and] there is alcoholism." "She keeps hooking up with . . . losers." "[M]arried twice, divorced, [she] went back to her first husband who had already

20

been abusive to her [and later] gets involved with a man who's already married . . . , Shane's father." Kormondy "didn't know who his father was"; he was "born without a father into an impoverished situation. His mother, on public assistance, "sends him [to live] with an aunt," so "[t]he bond with his mother gets broken at six months."

On cross-examination by Edgar, Dr. Larson agreed that the psychological testing revealed that Kormondy was "potentially a very violent person[,] . . . a very bitter, unhappy person who tend[ed] to be abusive of those around him that are close to him," and someone who would have "difficulty sympathizing with the victim."

Edgar had Dr. Larson recall some of the specifics of Kormondy's previous criminal behavior. At an early age, Kormondy escaped from the DART program. He started using crack cocaine at age fourteen. He used "a range of substances . . . . [H]is mother caught him huffing gasoline [and using] alcohol [and] marijuana." Soon, he was arrested for juvenile violations, for example, "battery on other people, thefts, [and] criminal mischief," which led to "Community Control," a form of house arrest. Kormondy violated house arrest by engaging in a "spree of burglaries and crimes" which resulted in him being "placed in the restitution center[,] . . . a resident treatment program." After another crime spree, more

21

burglaries and thefts, Kormondy was sent to prison. According to his wife and his mother, "he vowed to go off drugs after he had been incarcerated," and attended some "Narcotics Anonymous" meetings without success.

Kormondy's criminal activity continued after he was arrested for the McAdams murder and taken into custody; he was awaiting a charge for "homosexual rape" at the Santa Rosa County jail. Dr. Larson opined that he "would expect" that a person with the "kind of personality disorder" Kormondy possessed would engage in the criminal behavior the prosecutor cited in his questioning.

Davis complemented Dr. Larson's testimony with the testimony of a pharmacologist, Robert Markowitz, and a physician, Donald G. Morton, M.D. Markowitz, whose speciality was psychopharmacology, a subspeciality of pharmacology concerned with drugs that affect behavior, testified in the abstract as to the character traits inevitably exhibited by a person addicted to drugs, particularly alcohol and cocaine. The traits he described were the same traits Kormondy had been exhibiting prior to his arrest for the McAdams murder.

Dr. Morton, a physician specializing in pathology and diagnostic medicine, had been devoting, since 1982, his "full medical energies toward treating the addict and the alcoholic." The Defense employed him to evaluate Kormondy. He

22

interviewed Kormondy, who told him that he had been using alcohol and crack cocaine since he was thirteen.  He also interviewed Kormondy's sister, Laura, and his brother, Vernon; read depositions taken in the case; and reviewed Kormondy's records in the Oklahoma and Escambia County school systems.  Dr. Morton's diagnosis was that Kormondy "is addicted to cocaine and alcohol [and] that he is poly-addicted to several other drugs that he's experimented with in the past." Kormondy inherited the "susceptibility to chemical disease" and was suffering from "antisocial personality disorder."

Davis's last witness was Kevin Timothy Beck, an attorney.  Beck had represented Buffkin at his trial.  He said that the State offered Buffkin a life sentence (after the jury returned a verdict, but before it was published) in exchange for a plea of guilty to first degree murder because the State was convinced that Buffkin was not the trigger man and it wanted Buffkin to testify against Hazen at Hazen's trial.  On cross-examination, and over Davis's objection, Beck stated that Buffkin, on deposition, said that "Kormondy told him, while in the jail, that if he ever got out, he would in fact kill William Long and Cecilia McAdams."

The Defense rested following Beck's testimony.  The State put on no rebuttal.  In closing argument, Edgar argued that the guilt phase evidence

23

established five aggravating circumstances, that they outweighed the Defense's mitigating evidence, and that the jury should recommend a death sentence.

Davis, in closing, urged the jury to recommend life imprisonment for two reasons. First, it would be "fundamentally unfair" for Buffkin, who was, in Davis's words, the "ring leader," to receive a life sentence and Kormondy be sentenced to death. Second, Kormondy was the product of an impoverished environment. He was born to a mother who lacked parenting skills and a father who rejected him at birth and later denied paternity, a mother who married alcoholics, who abused her and her children, and a mother who had a violent temper. In counsel's words, "she was a mean woman." Davis recognized that

> many people overcome poverty, the absence of a parent, the absence of love and they grow up; but nevertheless, they grow up in a neighborhood where they develop life-long friends outside of the family. . . . There are safe places to go. There are normal people to be around. . . . They learn how to live properly in the world from people outside of the family. Not Shane. He was never in any one place long enough to develop those friendships. He was moved around like a piece of baggage, . . . ten times by the age of 13. He never had this sense of belonging anywhere, no safe place in his home, no safe place in the community.

And to make matters worse, he was "born with the disease of addiction." He inherited the susceptibility to chemical disease. He was incapable of leaving drugs and alcohol alone. Davis urged the jury to take all of these things into account.

24

They could not justify Kormondy's behavior, but they could justify a recommendation of life imprisonment.

On July 9, 1994, after deliberating for four hours, the jury returned its verdict. By a vote of eight to four, it recommended that the court sentence Kormondy to death.

## C.

Judge Kuder scheduled Kormondy's sentencing for October 7, 1994, and ordered the State's Probation and Parole Services to prepare and submit to the court and the parties a Presentence Investigation Report. The Report, dated September 16, 1994, contained under the heading "Socioeconomic Status" an "Alcohol/Substance Abuse" section, which his mother verified. Under the "Alcohol" subheading, the report recited that Kormondy had "been drinking since he was a teenager. . . . [and] ha[d] [a]ttended Cordova Counseling for alcohol treatment." Under the "Drugs" subheading, the report stated that Kormondy "used LSD[ and,] when he was a teenager[,] he used cocaine three (3) or four (4) times a week." As "Comments," the report recited: "The defendant stated that during the night of the crime he had smoked about 4 or 5 crack cocaine rocks, he had been drinking all day[,] and was high on cocaine and alcohol."

25

The Report set out Kormondy's juvenile and adult criminal histories under the heading "Prior Record (Juvenile/Adult History)." The "Summary" of Kormondy's juvenile record indicated that he had been placed in "Juvenile Probation and After Care" and had "completed the placement" fourteen times. The "Summary" of Kormondy's adult record indicated that he had been placed on "[p]robation" four times and that probation had been "[r]evoked" three times. He had been sent to "[p]rison" three times and, on one occasion, had "[c]ompleted" parole.

Kormondy's adult record was broken down into a listing of each offense Kormondy had committed and the ultimate disposition. Several offenses occurred in 1990, on January 17, February 7, March 19, and May 14; others occurred in 1991, on February 2, March 12, and April 14.[13] One occurred after he had been

---

[13] The Report listed these offenses by arrest date, arresting authority, offense, and disposition, as follows:

| Date | Place | Offense | Disposition |
|------|-------|---------|-------------|
| 1/17/90 | ECSO | Theft, Grand Theft Auto, Burglary Structure Dwelling, Petit Theft, VOCC | DKT #90-0603, 5/16/90; pled nolo contendere as charged, adjudication of guilt withheld, community control for 12 months under CT.'s 1 & 2, each count concurrent, followed by 2 years probation with special conditions to make restitution as determined by probation and parole in all counts. Probation 6 months under CT.'s 3 & 4, each count concurrent and concurrent with 1 & 2, this case concurrent with DKT #89-6828 and merged for cost. |

26

| 2/7/90 | ECSO | Trespass Structure Conveyance | DKT#90-14350, 11/16/90; pled nolo contendere as charged, adj. Guilty. 6 months probation. COS waived while in restitution center, CJ 30 days suspended upon condition completed time and restitution center. |
|--------|------|-------------------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 2/7/90 | ECSO | Theft, Grand Theft Auto, Battery General, VOCC | DKT #90-0604, 5/16/90; pled nolo contendere as charged, adjudication of guilty W/H, community control for 12 months under CT. 1 followed by 2 years probation with special conditions to make restitution in all counts as determined by probation and parole. Probation 6 months under CT.'s 2 & 3, each count concurrent with DKT #98-6228 and merged for cost. |
| 3/19/90 | ECSO | Burglary Structure Dwelling, Grand Theft $300 < $20,000 | DKT #89-6828, 5/16/91; pled nolo contendere as charged, adjudication of guilt w/h placed on community control for 12 months, each count concurrent followed by 2 years probation, make restitution of $1,211.58 as directed by Supervisor and pay $284.50 Cost. |
| 5/14/90 | ECSO | Grand Theft Auto, Criminal Mischief > "$1,00," Grand Theft Auto, Resisting Officer W/Violence, Burglary Unoccupied Structure Conveyance (3) counts | DKT #90-1325: 5/16/90, nol processed CT.'s 6 & 7, pled nolo contendere to CT/ 1, 2, & 3 as charged.  Pled nolo contendere to CT. 4 & 5 as charged. Adjudication of guilty W/H, community control for 12 moths under CT.'s 1, 2, 3 & 5, each count concurrent followed by 2 years probation and on condition make restitution in all counts as determined by Probation & Parole . Probation 6 months under CT. 4, concurrent with CT.'s 1, 2, 3 & 5, this case to run concurrent with DKT #89-6828 and merged for cost. |
| 2/12/91 | ECSO | Burglary Occupied Structure Conveyance, Grand Theft $300 < $20,000 | 5/21/91, adjudicated guilty of SP 3 years each count concurrent and concurrent with 89-6828 and with credit for 71 days. |

27

arrested and incarcerated in the Escambia County jail for the McAdams murder:

on February 18, 1994, he was charged with "Possession of [a] Controlled

Substance" and "Possession of Drug Paraphernalia" and was to be tried for the

offense on September 26, 1994.  As indicated in note 12, supra, the 1990 and 1991

offenses included "Theft," "Grand Theft Auto," "Burglary Structure Dwelling,"

"Burglary Occupied Structure," "Battery," and "Resisting Officer [with]

Violence."

Kormondy was sentenced on October 7, 1994.  After hearing from the

parties and affording Kormondy his right of allocution, Judge Kuder found the

following statutory aggravating factors:[14]

| 3/12/91 | ECSO | VOCC | DKT #89-6828, 5/21/91; pled nolo contendere to VOCC, found guilty of VOCC.  Community Control revoked, adjudicated guilty as charged. SP 3 years each count concurrent with credit for 133 days. |
| 11/14/91 | ECSO | VOP | DKT #90-14350, 1/9/92; found guilty of VOP, probation terminated, case terminated. |
| 2/18/94 | ECSO | Possession of Controlled Substance, Possession of Drug Paraphernalia, Enter Control Substance Into Jail | DKT #94-0898: pending, set for jury trial 9/26/94. |

[14]  See Fla. Stat. § 921.141(1)(5)(b), (d), (e), (f), and (i), and also supra note 10.

28

(1) the defendant was previously convicted of a felony involving the threat of violence to the person; (2) the capital felony was committed while the defendant was engaged or was an accomplice in the commission of or an attempt to commit or flight after committing or attempting to commit a burglary; (3) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; (4) the capital felony was committed for pecuniary gain; and (5) the capital felony was a homicide and was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification.

Kormondy v. State (Kormondy I), 703 So. 2d 454, 457 (Fla. 1997) (per curiam).

Judge Kuder then considered the mitigating evidence in the record, finding nothing to support any of the statutory mitigating circumstances. He next considered the non-statutory mitigating factors. The Florida Supreme Court described what Judge Kuder found and the weight he assigned to Kormondy's evidence in mitigation:

As to nonstatutory mitigation, the trial judge considered Kormondy's childhood deprivations. He found that "the deprivation, trauma, and loss of paternal comfort and companionship suffered during Kormondy's early years are reasonably established by the evidence as nonstatutory mitigating factors. The Court gives these factors moderate weight." This statement must be tempered by the judge's finding that "[t]he Court is well satisfied that Kormondy is more a product of his failure to choose a positive and productive lifestyle than a victim of family dysfunction." Kormondy also asked the trial judge to consider his drug addiction as nonstatutory mitigation. The judge found that "[a]lthough the fact of Kormondy's drug addiction is established by the evidence, the Court finds that his addiction is not reasonably established as a non-statutory mitigating factor and gives it no weight." The trial court also gave no weight to Kormondy's

29

learning disability and lack of education.  Moderate weight was given to the fact that Kormondy was a good employee in the past.  The trial court further gave little weight to the fact that Kormondy was drinking alcoholic beverages before the crimes were committed.  Little weight was also given to the fact that Kormondy was well-behaved at trial.  No weight was given to either the fact that Buffkin received disparate treatment or that Kormondy has a wife and child.  As to the former consideration, the trial judge found that the "evidence establishes beyond and to the exclusion of every reasonable doubt that Gary McAdams was in fact killed by defendant Kormondy."  Further, no weight was given to Kormondy's suggestion that he cooperated with law enforcement.  In denying this suggestion, the trial judge wrote, "It is also significant that when he was subpoenaed by the State to testify against co-defendant Hazen he refused to do so even after having been given use immunity."  Finally, the trial judge gave moderate weight to the fact that Kormondy has a personality disorder.

Id. at 457–58 (alterations in original).  After weighing all of the sentencing factors,

Judge Kuder  sentenced Kormondy to death.[15]

D.

Kormondy appealed his convictions and death sentence to the Florida

Supreme Court.  The Supreme Court affirmed his convictions, but vacated his

death sentence and remanded the case "for a new penalty-phase proceeding before

---

[15] As for Kormondy's "convictions for three counts of armed sexual battery, one count of burglary of a dwelling with an assault and an intent to commit a theft, and one count of armed robbery[,] . . . Kormondy was sentenced to a [consecutive] life sentence for each . . . conviction[]."  Kormondy v. State (Kormondy I), 703 So. 2d 454, 463 (Fla. 1997) (per curiam).

a new jury." Kormondy I, 703 So. 2d at 465.[16] The court did so because it found

reversible error in the trial court's admission, over Kormondy's objection, of

Beck's statement that Buffkin, on deposition, said that "Kormondy had told him,

while in jail, that if he ever got out, he would in fact kill William Long and Cecilia

McAdams." Id. at 461–62, 463. The "testimony that Kormondy said he would

kill again" amounted to an "impermissible nonstatutory aggravation." Id. at 463.[17]

---

[16] In affirming Kormondy's murder conviction, the Supreme Court held that the evidence (in the guilt phase) was insufficient to establish first-degree premeditated murder, see Fla. Stat. § 782.04(1)(a)1, because "the State failed, with its evidence, to exclude the reasonable possibility that the shooting was accidental." Kormondy I, 703 So. 2d at 459. The court let the murder conviction stand, however, because "the record clearly support[ed] a conviction for first-degree felony murder." Id. at 460; see also Fla. Stat. § 782.04(1)(a)2. None of the issues Kormondy raised in challenging his convictions is pertinent here.

[17] The Supreme Court went on to say that,

[f]or this evidence to be admissible at the penalty-phase proceeding, it has to be directly related to a specific statutory aggravating factor. Otherwise, our turning of a blind eye to the flagrant use of nonstatutory aggravation jeopardizes the very constitutionality of our death penalty statute. Finally, we are unable to say that this evidence about Kormondy's desire to commit future killings, when presented to the jury by an attorney, was harmless beyond a reasonable doubt.

Kormondy I, 703 So. 2d at 463.

31

II.

A.

The Circuit Court received the <u>Kormondy I</u> mandate on January 26, 1998. Davis, who had represented Kormondy during the penalty phase of the case in 1994, commenced preparation for the retrial of that phase.

On April 16, 1998, Kormondy moved Judge Kuder to discharge Stitt and Davis on the ground that the Public Defender's Office was too busy to give his case the attention it deserved and to appoint substitute counsel from the private bar. Alternatively, he wanted Stitt removed because (1) she told him prior to trial in July 1994, that the jury would likely "find him guilty of murder" and "failed to keep and maintain his trust" and (2) he was going to file a claim that she had rendered "ineffective assistance" during the guilt phase of the case in 1994, which would create a conflict of interest.

Judge Kuder held a hearing on Kormondy's motion on May 14, 1998. Kormondy was present along with Stitt and Davis. After hearing what Kormondy had to say in support of his motion and the attorneys' responses, the judge found no evidence of ineffective assistance or lack of resources in the attorneys' preparation and presentation of Kormondy's defense at trial. He denied the motion because Kormondy presented only bare assertions.

32

On a date not revealed by the record, Judge Kuder scheduled the retrial of the penalty phase for July 7, 1998. Prior to that date, the trial date was moved to July 27, 1998. The trial date was later moved to September 22, 1998, and again to November 16, 1998.[18]

On October 28, Kormondy, proceeding pro se, moved Judge Kuder to recuse, to discharge Stitt and Davis as his attorneys, and to appoint substitute counsel from the private bar. Stitt prepared the motion for Kormonday after visiting him in jail the previous Monday, October 26, and Davis presented the motion to the court on Kormondy's behalf. Kormondy's grounds for moving for Judge Kuder's recusal were two-fold: (1) Gary McAdams had worked for First Union Bank as a loan officer, and Judge Kuder had done business with him; and (2) Judge Kuder's wife was employed by the State Attorney, whose office was prosecuting the case. For these reasons, Kormondy felt that, unless Judge Kuder recused, he could not receive a fair trial.

Kormondy's grounds for seeking the discharge of Stitt and Davis and the entire Public Defender's Office were: (1) he lacked confidence in the Public Defender's Office; and (2) Stitt had been a member of the same high school class as Gary McAdams, from 1969 to 1972 (their graduation year), and had known

---

[18] The record does not indicate the reason(s) for the continuances.

33

McAdams though class activities and school events during that time. For this sole reason, she had, in Kormondy's mind, a conflict of interest.

Judge Kuder held a hearing on Kormondy's motions the same day, October 28. Present were Edgar, Stitt, Davis, and Kormondy. Davis presented the motions; Stitt and Kormondy testified. Stitt testified that at a pretrial conference long before the case went to trial in July 1994, she informed Judge Kuder and Edgar that she and Gary McAdams had been high school classmates some twenty years before, that they had been nothing more than classmates, that she had never represented him or his family, that she had informed Kormondy of the classmate relationship, and that Kormondy had not been concerned. The first time Kormondy told her that the relationship concerned him was when she visited him at the jail on Monday, October 26, 1998.[19] As the result of her conversation with him at the jail, she concluded that Kormondy no longer felt "trustful" of her or the Public Defender's Office, which caused her "great problems going forward with the representation." She therefore agreed with Kormondy that she should prepare

---

[19] At the May 14, 1998 hearing on his motion for the appointment of substitute counsel to replace Stitt and Davis, Kormondy did not raise the high school relationship issue as a reason for providing him with substitute counsel; rather, his complaint was that he had lost confidence in the Public Defender's Office.

34

a motion calling for her and Davis's discharge and the appointment of a lawyer from the private sector of the bar.

At the conclusion of the hearing, Judge Kuder, ruling from the bench, granted Kormondy's motion, discharged Stitt and Davis, and appointed Spiro Kypreos, a private practitioner, to represent Kormondy. Judge Kuder then recused and was replaced by Circuit Judge Joseph Q. Tarbuck. The trial, which had been scheduled to begin on November 16, 1998, was rescheduled for April 5, 1999.

On November 13, 1998, Judge Tarbuck relieved Kypreos of his appointment (for reasons not in the record) and appointed James Jenkins, a Pensacola lawyer, in his place. Jenkins was unable to take the appointment, and Raymond Arnold, also a Pensacola lawyer, was appointed on December 7, 1998.

B.

On February 15, 1999, Arnold filed with the court a motion to preclude the State from seeking the death penalty.[20] Arnold based the motion on the evidence presented to the jury during the guilt phase of the trial. He argued that such evidence was insufficient "to show that Kormondy intended to kill the decedent.

---

[20] Also on February 15, 1999, Arnold filed a motion to require the State to designate the aggravating circumstances on which it was seeking the death penalty and to allow the defendant to depose every witness the State previously had identified. Within that motion, Arnold contended that the State should be limited to presentation of "only that guilt phase evidence necessary to prove aggravating circumstances." The record does not indicate whether the court ruled on this motion.

35

There exists no evidence to show other than that the firing of the gun was accidental.  Accordingly, this case does not meet the culpability requirement of either Enmund or Tison in a felony-murder case."[21]  On March 1, 1999, while that motion was pending, Arnold moved the court for a change of venue, arguing that a fair trial could not be obtained in Pensacola due primarily to the publicity the case had engendered following the McAdams murder.  Two weeks later, Arnold filed a "Notice of Intent Not to Present Evidence of Mitigating Circumstances."  The notice "announce[d] that [Kormondy would] not present any evidence pertaining to mitigating circumstances."  He further requested that the State "be precluded from presenting any evidence pertaining to Defendant's prior mental, physical, or psychological condition [or] evidence of any prior criminal history or collateral conduct or offenses."

Judge Tarbuck heard these motions on March 23, 1999.  Addressing the motion to preclude the State from seeking the death penalty, Arnold argued that the State should be barred from seeking the death penalty because a death sentence would be disproportional, given that Buffkin and Hazen, who were as culpable as

---

[21]  In Enmund v. Florida, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982) and Tison v. Arizona, 481 U.S. 137, 107 S. Ct. 1676, 95 L. Ed. 2d 127 (1987), the Court considered the propriety, under the Eighth Amendment's ban on cruel and unusual punishment, of the death penalty where the defendant neither took life, attempted to take life, nor intended to take life.

36

Kormondy, were sentenced to life imprisonment. Judge Tarbuck denied the motion. Next, he deferred his ruling on Arnold's motion for change of venue until trial; he would grant the motion if pretrial publicity precluded the selection of an unbiased jury. At this point in the hearing, Arnold informed the court that he could not be ready for trial on April 5 and moved for a continuance. He reminded the court that to establish the aggravating circumstances necessary to warrant imposition of a death sentence, the State would be calling most, if not all, of the witnesses who testified for the State at the guilt phase of the trial, and he would need to know what they would be saying—especially with respect to manner in which the killing occurred. And since he did not intend to present any mitigating evidence, Kormondy's case would depend on the quality of his cross-examination of the State's witnesses.

Judge Tarbuck granted the requested continuance, set the trial for May 3, 1999, and informed the parties that he would entertain on April 5 any matters that should be considered prior to jury selection. One matter that would have to be addressed would be whether Kormondy was willing to waive his right to present mitigating evidence. Edgar and Arnold agreed that, before the trial commenced, the court would have to address Kormondy in person and, in accordance with the Florida Supreme Court's instructions in Koon v. Dugger, 619 So. 2d 246, 249–50

37

(Fla. 1993) (per curiam), determine whether he understood that he had the right to present mitigating evidence, whether he understood the sentence the jury might recommend if he chose not to exercise that right, and whether he was waiving the right knowingly and voluntarily.[22]  Before the hearing ended, Arnold announced that "[a]t this time, I'll withdraw the notice of intent not to present evidence of mitigating circumstances."  He then added that "I may have to refile the [notice], but . . . have it heard during April."

_____

[22]  In Koon v. Dugger, Raymond Koon, a death row inmate, appealed the denial of his post-conviction claim, presented pursuant to Fla. R. Crim. P. 3.850, that his attorney rendered ineffective assistance of counsel in the penalty phase of his trial because he "failed to investigate and present significant mental health mitigation that would have resulted in a life recommendation from the jury."  619 So. 2d 246, 249 (Fla. 1993) (per curiam).  Specifically, "counsel failed to develop and present evidence of his impoverished childhood, his military service, his alcoholism, and other nonstatutory mitigation."  Id.  The Supreme Court affirmed the denial of Koon's claim because it was unrebutted that Koon prohibited counsel from presenting any mitigating evidence.  Id.  "Koon instructed him not to do so."  Id.  As counsel testified, "Koon's position all along was that he did not want to spend the rest of his life in prison. [Counsel] testified that he was afraid that if he attempted to present witnesses against Koon's wishes, Koon would make a scene in front of the jury.  Id.

In affirming the denial of Rule 3.850 relief, the Supreme Court, using its supervisory power, instructed Florida's trial courts as to what they should do when faced with a situation in which a defense attorney foregoes the presentation of mitigating evidence pursuant to the client's instructions.

> [W]e establish the following prospective rule to be applied in such a situation. When a defendant, against his counsel's advice, refuses to permit the presentation of mitigating evidence in the penalty phase, counsel must inform the court on the record of the defendant's decision.  Counsel must indicate whether, based on his investigation, he reasonably believes there to be mitigating evidence that could be presented and what that evidence would be. The court should then require the defendant to confirm on the record that his counsel has discussed these matters with him, and despite counsel's recommendation, he wishes to waive presentation of penalty phase evidence.

Id. at 250.

38

On April 6, 1999, Arnold moved the court in limine to enter an order "prohibiting the State from 'doubling up' alleged aggravating circumstances, either in testimony or argument in the penalty phase of trial." In the previous penalty phase, in 1994, the State had argued that the evidence established five of the aggravating circumstances listed in Fla. Stat. § 921.141(1)(5)(b), (d), (e), (f) and (i).[23] Arnold argued that to allow the State to assert that "the capital felony was committed during the course of a burglary, . . . to avoid arrest or to allow escape, and . . . for pecuniary gain . . . [would result] in doubling or tripling of aggravated circumstances." Judge Tarbuck heard the motion on April 16, 1999. At the conclusion of the hearing, he ruled that the applicable aggravating circumstances would be determined depending on the evidence the State presented at trial.

## C.

The penalty phase of the trial began on May 3, 1999, as scheduled. Prior to jury selection and in the absence of the venire, Arnold renewed his motion to preclude the State from seeking the death penalty. He argued that the Florida Supreme Court's decision in Jackson v. State, applying the United States Supreme Court's decisions in Enmund v. Florida and Tison v. Arizona, precluded the death

---

[23] See supra note 10.

penalty because the case involved multiple defendants, Kormondy, Buffkin and

Hazen, no eye witnesses, and nothing but circumstantial evidence.  See Jackson v.

State, 575 So. 2d 181, 193 (Fla. 1991) ("Enmund and Tison are not satisfied in [a]

murder case with multiple defendants and no eyewitnesses where all evidence is

circumstantial and the actual killer is not clearly identified[.]").  The court was not

persuaded and denied Arnold's motion.

Following a brief recess to enable Arnold to confer with his client, the

following took place before Judge Tarbuck:

> MR. ARNOLD: The defendant would announce to the State that he will not
> rely on the mitigator found at [Fla. Stat. § 921.141(6)(a)], that is no
> significant prior criminal activity or history.  And I believe that should
> preclude the State from presenting evidence on prior record.  Do you agree
> to that?
>
> MR. EDGAR: It depends on the manner in which the Defense conducts its
> case involving mitigation.
>
> MR. ARNOLD: Certainly.
>
> MR. EDGAR: But I will not preempt that by offering evidence initially,
> obviously.
>
> THE COURT: We will defer ruling on that until such time as the
> presentation of all evidence is concluded.
>
> MR. ARNOLD: The next one is the defendant would announce to the State .
> . . that it will not rely on the mitigator found at [Fla. Stat. § 921.141(6)(b)],
> which argues that the defendant was under the influence of extreme mental

or emotional disturbance.  We will not argue or present evidence with regards to that mitigator.

MR. EDGAR: I understand.

MR. ARNOLD: The next is that the defendant will announce that it will not rely on the mitigator that the victim was a participant or consented to in any manner the offense or offenses.  Next is that the defendant will announce to the State that it will not rely upon the mitigator indicating that the defendant had any lack of capacity to conform himself to the law.

MR. EDGAR: I understand.

MR. ARNOLD: Next, the defendant would announce to the State that it will not rely upon the mitigator dealing with family background, alcoholism or drug use or mental problems or abuse by parents.  Did you get all of those?

MR. EDGAR: I understand.

MR. ARNOLD: Judge, I believe that the Court has to examine the defendant under [Koon v. Dugger] to make sure that he understands and acknowledges that I have discussed with him those announcements and that he agrees with them.

THE COURT: Mr. Kormondy, have you heard what your lawyer just announced to the Court —

THE DEFENDANT: Yes.

THE COURT: — for the record?

THE DEFENDANT: Yes.

THE COURT: Do you agree that those, with what he has said?

THE DEFENDANT: Yes, sir.

41

MR. EDGAR: Could the Court briefly, if I could suggest, that the defendant be asked that he understands that he had a right to present those matters that he presented [in the previous penalty phase], and even more if he choose or less and that those matters could be considered by a jury and might, in fact, be considered by a jury to outweigh possibly aggravating factors that could exist and, therefore, could result in jury recommendation of life, but that is a tactical choice by the defendant or strategic choice that I presume he's made.  If we could ask, with the advice and representation of counsel, if he's fully discussed that matter with counsel and understands the consequences and effects of that?

MR. ARNOLD: Judge, I would be pleased to ask the defendant those items and then have the Court examin[e] him with regard to each one, if you would like for me to do so?

THE COURT: All right.

MR. ARNOLD: Mr. Kormondy, have we discussed the fact that tactically it would be beneficial to you to announce to the State that you would not present evidence or testimony or argument dealing with the fact that you have no prior criminal history because, in fact, you do have a prior criminal history; is that correct?

THE DEFENDANT: Yes.

MR. ARNOLD: And do you understand that . . . the State, of course, could come back in and impeach us or impeach you if you so testified that you had no prior criminal history?  We've discussed that?

THE DEFENDANT: Yes.

MR. ARNOLD: And you agree to the waiver of that particular mitigator?

THE DEFENDANT: Right.  Yes.

MR. ARNOLD: The next matter is that during the guilt phase trial, there was testimony taken by the lawyers who represented you . . . dealing with

42

the fact that you may have previously been under some sort of extreme mental or emotional disturbance or that you may have been, if not addicted to, at least abusing crack cocaine and other drugs or alcohol and, in fact, there was testimony by a psychologist or psychiatrist with regards to those matters; and do you understand that those avenues of defense are available to you at this time?

THE DEFENDANT: Yeah.

MR. ARNOLD: And have we discussed those matters, and are you satisfied that it is not in your best interest to present those particular types of aggravators or mitigators in this case?

THE DEFENDANT: Yes.

MR. ARNOLD: The same thing goes with the mitigator that I announced to the Court and to the State dealing with your lack of capacity to conform to the laws of our state or to the laws of the United States.  Do you understand that you have the right to present testimony that you simply don't have the ability to follow the law, and because of some other pressing problem, mentally or emotionally or whatever, do you understand that?

THE DEFENDANT: Yes.

MR. ARNOLD: And we have discussed those and you have agreed to waive those as mitigators?

THE DEFENDANT: Yes, sir.

MR. ARNOLD: And there was some testimony previously, and you have the availability of that testimony now to present testimony that you either had mental problems associated with your childhood upbringing or that you were either abused, and that doesn't mean that you were—necessarily that you were beaten, it could mean that your were either beaten or sexually or mentally or any other way abused by parents or a figurehead or persons of authority over you.  Do you understand that you still have that avenue of defense available to you at this time?

43

THE DEFENDANT: Yes.

MR. ARNOLD: And we have discussed that avenue of defense and all of those various matters?

THE DEFENDANT: Yes, sir.

MR. ARNOLD: And are you satisfied that it is in your best interest not to present testimony, evidence or argument pertaining to those mitigators?

THE DEFENDANT: Yes.

MR. ARNOLD: There was another mitigator that I mentioned and it had to do with whether or not the victim in this particular case, . . . Gary McAdams, in any way participated or consented to the offense and, of course, you're not claiming that in any way . . . , are you?

THE DEFENDANT: No.

MR. ARNOLD: And you would waive that mitigator?

THE DEFENDANT: Yes.

MR. ARNOLD: Judge, I believe I've covered those mitigators.  Are you satisfied, Mr. Edgar?

MR. EDGAR: Yes, Your honor.  I just wanted to make sure that they discussed it to the defendant's satisfaction.  I know Mr. Arnold is an experienced attorney and he's fully capable of advising his clients.  I just wanted to make sure that the defendant understood and that he had that opportunity and what effect that would have by not doing that, what effect it might possibly have, it could make a difference in this matter and that he should be aware of that for his own reasons and advice of counsel, he's choosing not to do that.

44

THE COURT: Mr. Kormondy, you heard your lawyer announce to the Court the various mitigators that you're waiving; have you discussed each of those at length with him and arrived at the conclusion that it would not be in your best interest to present those?

THE DEFENDANT: Yes, sir.

THE COURT: You're satisfied that your lawyer has adequately represented you and represented things to you in regard to those mitigators so that you could make an intelligent decision with regard to not wanting the introduction of those into evidence?

THE DEFENDANT: Yes, sir.

THE COURT: Anything else?

MR. ARNOLD: Those conclude mine.

THE COURT: All right.  We should have the cards momentarily and begin the jury selection process.

A jury was empaneled by mid-day on May 3, 1999, and excused until the following morning.  The trial began that morning with the attorneys' opening statements.  Edgar informed the jury that an earlier jury had found Kormondy guilty of the first degree murder of Gary McAdams, the sexual battery of Cecilia McAdams, burglary, and armed robbery, and then outlined the evidence that led to the jury's verdicts—beginning with the assemblage of Kormondy, Buffkin, and Hazen at Kormondy's Pensacola residence on July 10, 1993, and ending with the statements Kormondy gave the police following his arrest.  That evidence, Edgar

45

submitted, would establish the aggravating circumstances necessary for the imposition of the death penalty and would be sufficient to overcome any mitigating evidence the defense might put forth.

Arnold, in his opening statement, said there would be "testimony that it was not Kormondy who actually killed Mr. McAdams" and that the jury would hear "different testimony as to how he was killed and by whom." The mitigating circumstances that would weigh against a jury recommendation of death and in favor of life imprisonment would be that there was "no intent to kill" Mr. McAdams; that Buffkin and Hazen, who were equally culpable, had received life sentences; and that without Kormondy's cooperation with law enforcement, Buffkin and Hazen would not have been captured.

The State called twenty witnesses; their testimony and the State's exhibits established the facts that led to Kormondy's conviction at the conclusion of the guilt phase of the trial in July 1994. After the last witness stepped down, Edgar announced that the State and the Defense, with Kormondy's consent, had stipulated to the crimes of which Kormondy, Buffkin, and Hazen had been convicted, and that these "violent felonies" constituted "an aggravating factor." With that stipulation, Edgar rested the State's case.

The court then asked Arnold to call his first witness.  After conferring with

Kormondy, the following exchange occurred:

MR. ARNOLD: Judge, at this time the Defense likewise rests, and I
think that you need to inquire of the defendant out of the presence of
the jury.

THE COURT: Is there anything further that you wish to present in this case,
Mr. Kormondy?

THE DEFENDANT: No, Sir.

THE COURT: Have you discussed all aspects of the presentation of
evidence in your behalf with your lawyer?

THE DEFENDANT: Yes, sir.

MR. EDGAR: I have some matters to inquire into.  I'd request that the jury
be excused briefly.

THE COURT: Ladies and gentlemen of the jury, please retire.

   (Jury out.)

MR. EDGAR: Your Honor, previously [during the penalty phase of the trial
in 1994] the defendant introduced evidence and submitted arguments to the
jury that recommended death and to the Court that sentenced him,
concerning his background, his family background, his substance abuse,
some mental/emotional disturbances, his childhood deprivations and other
matters.  That did not have apparently as much effect at that time as I guess
as it was intended.  However, given that there are less aggravators being
submitted by the State at this time as a result of the [Kormondy I] opinion, I
wanted just the Court to advise him that if it didn't work before, it doesn't
mean that it won't work now.  And that he's to be advised that he could still
do that, that he's free to do that, and if this is what he wants to do.

47

Otherwise, that he's discussed that with counsel, he's satisfied and knows the consequences and he nonetheless wishes to proceed on this course.

In other words, I just want to make sure the record is clear that he knowingly and voluntarily and intelligently makes this election so that later if this doesn't go the way that he would prefer, then we wouldn't be back here arguing that well, I wasn't told exactly what the situation was. That's what I wanted to tell the Court just to address in a little more detail.

MR. ARNOLD: Judge, I'd be pleased to examine him, if you'd like for me to. Then you may help —

THE COURT: All right.

MR. ARNOLD:  Mr. Kormondy, have I discussed with you the statutory mitigating circumstance, that the defendant has no significant history of a prior criminal activity and we have previously announced that we would not deal with that and the State likewise agreed they would not deal with it?

THE DEFENDANT: Yes, sir.

MR. ARNOLD: Did we do that as a part of the strategy proceeding in this case?

THE DEFENDANT: Yes, sir.

MR. ARNOLD: With regards to the second statutory mitigating circumstances, the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance. Did I discuss with you any – not only medically diagnosed problems, but any problems you may have thought about dealing with mental or emotional disturbance, and did we rule out any evidence or argument pertaining to whether or not you were under the influence of extreme mental or emotional disturbance?

THE DEFENDANT: Yes, sir.

48

MR. ARNOLD: And did we agree that as part of our strategy that it may be in your best interest not to present that testimony so that we did not open the door for the State to put evidence in on some other matters?

THE DEFENDANT: Yes, sir.

MR. ARNOLD: With regards to the statutory mitigator that the victim was a participant in the defendant's conduct or consented to the act, we have agreed that that was not true and that we would not use it as a statutory mitigator; is that correct?

THE DEFENDANT: Right.

MR. ARNOLD: With regards to the mitigator that the defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor, we are going to argue that.  May not request it as a jury instruction, but I may argue that if the evidence – if I believe that the evidence is present?

THE DEFENDANT: Right.

MR. ARNOLD: Agree?

THE DEFENDANT: Right.

MR. ARNOLD: With regards to the next statutory mitigator, the defendant acted under the extreme influence, dominion, duress, or control of another. Have we discussed that and agreed that that is not the case and that we would not present any argument or evidence pertaining to that mitigator?

THE DEFENDANT: Right.

MR. ARNOLD: Okay.  With regards to the next mitigator, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. Again, in conjunction with the emotional disturbance and that sort of thing, have we discussed that in detail and agreed that we would not present any evidence

49

or attempt to put any evidence or argument pertaining to that mitigator into the record?

THE DEFENDANT: Yes.

MR. ARNOLD: And that likewise is in your best interest not to do so?

THE DEFENDANT: Right

MR. ARNOLD: The age of the defendant at the time of the crime. If it's requested, the Judge always usually puts that into the jury instructions, although we've not really brought that up as an issue; is that correct?

THE DEFENDANT: Yes, sir.

MR. ARNOLD: There are a number of nonstatutory mitigators, and under no pretense do I attempt to tell you each and every one of them, okay?

THE DEFENDANT: Okay.

MR. ARNOLD: Because they can be most anything that someone can think of. Let me cover a few, if I may. With regards to family background or employment background or military service, we've not presented any evidence on those matters, correct?

THE DEFENDANT: Correct.

MR. ARNOLD: Do you desire to put in any evidence or argument pertaining to any of those three items?

THE DEFENDANT: No.

MR. ARNOLD: Okay. With regards to mental problems, which do not reach the level of extreme mental anguish or mental emotional defect, do you wish to present any testimony, argument or evidence pertaining to mental problems of any nature whatever?

50

THE DEFENDANT: No.

MR. ARNOLD: And we've discussed that fully and completely?

THE DEFENDANT: Right.

MR. ARNOLD: With regards to abuse of the defendant by parents, either physically, mentally, or sexually, we have agreed that there would be no testimony, evidence or argument pertaining to that nonstatutory mitigator; is that correct?

THE DEFENDANT: Yes, sir.

MR. ARNOLD: And we've discussed that in detail?

THE DEFENDANT: Right.

MR. ARNOLD: I believe that previously there was some testimony dealing with that and you discussed that with me and asked me not to present any evidence to the court, did you not?

THE DEFENDANT: Right.

MR. ARNOLD: Okay. With regards to contribution to the community or society or charitable or humanitarian acts or deeds, we have no evidence pertaining to those, correct?

THE DEFENDANT: Correct.

MR. ARNOLD: With regards to the quality of being a caring parent, I understand that you have a child but we've not presented any evidence dealing with that, correct?

THE DEFENDANT: Correct.

MR. ARNOLD: And it's not your desire to present any evidence dealing with those items?

51

THE DEFENDANT: (Shakes head negatively.)

MR. ARNOLD: The same thing goes with regular church attendance or religious devotion, such as that?

THE DEFENDANT: Correct.

MR. ARNOLD: We've talked about it, discussed it, you've agreed not to present it?

I have discussed with the State Attorney and we will present to the Judge shortly jury instructions which include the nonstatutory mitigators. One, being that you cooperated fully with law enforcement after your arrest; another being the two co-defendants are serving life in prison; another being you had no intent that Gary McAdams die as a result of these crimes that we talked about; and fourth, I'm asking the Court to present and be that you exhibited good behavior and good conduct during the course of this trial.

Are there any other nonstatutory mitigators that you think I should present to the Court?

THE DEFENDANT: (Shakes head negatively)

MR. ARNOLD: Judge, I think that I've covered the mitigators.  I hope I have.  Does that satisfy you?

MR. EDGAR: Yes, sir, Your Honor.  And I have jury instructions that conforms to that.  Does Your Honor desire to inquire of the defendant any[ ]more?

THE COURT: I do not.  I think it's been adequately covered.  What I propose is to bring the jury in now and tell them what stage of the trial we're at. . . .

After informing the jury that there would be no further testimony, the court

declared a lunch recess.  Closing arguments began at 1:00 p.m.  Edgar reviewed in

52

detail the testimony he had presented the previous two days and argued that it established two aggravating circumstances: (1) Kormondy had been convicted previously of "a felony involving the use of threat or violence, namely, the robbery of Mr. and Mrs. McAdams or the sexual battery of Mrs. McAdams"; and (2) Mr. McAdams's murder was "committed while [Kormondy] was engaged in or an accomplice in the commission of an attempt to commit a crime of burglary."[24] Given those aggravating circumstanecs, he urged the jury to return a verdict recommending a death sentence.

Arnold, in response, argued that several mitigating circumstances were present which the aggravating circumstances did not outweigh: Kormondy's sentence should be the same as Buffkin's and Hazen's, life imprisonment; Kormondy cooperated with investigators Cotton and Hall following his arrest, as both had testified; his cooperation led to the Buffkin's and Hazen's arrests; the gun fired accidentally, indicating that there was no intent to kill; and there was some doubt as to whether Kormondy pulled the trigger.

The jury returned its verdict in little over one hour. It recommended, by a vote of eight to four, that the court impose the death sentence.

---

[24]    Kormondy v. State (Kormondy II), 845 So. 2d 41, 48 (Fla. 2003) (per curiam).

D.

Judge Tarbuck scheduled sentencing for July 7, 1999. On May 7, Arnold provided Judge Tarbuck with a Sentencing Memorandum in which he argued against the imposition of the death penalty based on the same mitigating circumstances he proposed to the jury and an additional circumstance: Kormondy had exhibited good behavior and good conduct during the trial. Arnold also attached transcripts of testimony Hazen and Buffkin gave at Hazen's trial, testimony the jury did not hear. Hazen, testifying in his own defense, said that Buffkin admitted killing Mr. McAdams: "'He stops by the front and he says well, if I didn't do it like that, I was going to have to shoot him anyhow.'" Buffkin, a prosecution witness, testified that Kormondy did the shooting, that Kormondy was tapping the victim's head with the gun and it went off, accidentally. Buffkin couldn't have seen that because, as Mrs. McAdams testified, Buffkin was raping her in the master bedroom vanity when the shot was fired. Arnold closed his memorandum with this statement:

> The evidence in the instant case is such that nobody can say with any certainty exactly who actually killed Gary McAdams. . . . [A]lthough a felony-murder, nobody can establish that the shooting was not accidental. . . . If Kormondy is sentenced to death, while his two equally culpable co-defendants are sentenced to life, such is disproportional.

54

Judge Tarbuck sentenced Kormondy to death at the conclusion of the July 7, 1999, proceeding.  He found the two aggravating circumstances the State had argued to the jury, considered the mitigating circumstances Arnold had advanced, and concluded that the aggravators outweighed the mitigators.

E.

The Florida Supreme Court affirmed Kormondy's death sentence. Kormondy v. State (Kormondy II), 845 So. 2d 41 (Fla. 2003) (per curiam), cert. denied, 540 U.S. 950, 124 S. Ct. 392, 157 L. Ed. 2d 283 (2003).[25]  In doing so, the court disposed of on a state law ground one of the claims of error we address today: that "Kormondy was denied his right to cross-examine and confront state witness Cecilia McAdams concerning her ability to identify and distinguish the perpetrators" in violation of the rights secured by the Sixth Amendment's Confrontation Clause.[26]  Id. at 47.

---

[25]  Kormondy was represented on appeal by the Public Defender and an Assistant Public Defender for the Second Judicial Circuit of Florida.

[26]  The Sixth Amendment states, in relevant part: "In all criminal prosecutions, the accused shall have the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  This is known as the Confrontation Clause and is made applicable to the States through the Fourteenth Amendment's Due Process Clause.  Pointer v. State, 380 U.S. 400, 403–06, 85 S. Ct. 1065, 1068–69, 13 L. Ed. 2d 923 (1965).

III.

On August 30, 2004, Kormondy moved the Escambia County Circuit Court, pursuant to Florida Rule of Criminal Procedure Rule 3.851, to vacate his convictions and death sentence. His motion asserted, in the trial court's words, "multiple and cumulative instances of ineffective assistance of counsel on the parts of his original and his resentencing attorneys," each a denial of the right to effective representation guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. The motion was referred to Judge Tarbuck. After Kormondy amended the motion on April 5, 2005, Judge Tarbuck held an evidentiary hearing on the claims, on April 18 and 19, 2005, and assessed them in accordance with the standards prescribed by Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). On June 20, 2005, he entered an order denying Rule 3.851 relief. Two of the ineffective assistance claims are before the court in this appeal.

A.

The first claim alleged that Antionette Stitt, who represented Kormondy throughout the guilt phase of the case in 1993 and 1994, rendered ineffective of counsel when she "failed to . . . withdraw from representing Defendant prior to the guilt phase trial." According to Kormondy, Stitt should have moved the court to

56

withdraw because she was laboring under a conflict of interest: twenty years before Stitt undertook his representation, in 1993, she and Gary McAdams were high school classmates. This conflict, Kormondy said, rendered invalid of all of the convictions the 1994 trial produced.

Judge Tarbuck denied this claim after hearing testimony from Stitt and Kormondy. Stitt testified that after Judge Kuder appointed her to take on Kormondy's defense, she notified Judge Kuder, the State, and Kormondy that she had gone to high school with Mr. McAdams but did not have a close friendship with him. She described the relationship as being that of "nodding acquaintances"; they may have both been present at school social functions, but that they did not socialize with one another. Judge Tarbuck found Stitt's testimony "credible" and that Kormondy "failed to meet his burden of demonstrating . . . that trial counsel actively represented conflicting interests."

The judge found, moreover, that Stitt informed Kormondy of her relationship with the victim and that Kormondy's response was that "if it didn't bother her, then it didn't bother him."[27] He made this finding notwithstanding

---

[27] At the evidentiary hearing, Stitt stated:

He did not think it was a conflict nor did I. . . . He had not seen fit to ask me to remove myself from the case. Giving him all the conflicts, . . . such as the Long matter, the prior contact of mine with Gary McAdams, and by that time I was full-bored [sic] into the case, that is what I had been appointed by the court to do, and

57

Kormody's denial that in preparing the case for trial, Stitt had informed him of her relationship with the victim.[28]  Judge Tarbuck found his denial "not credible."

B.

The second claim Judge Tarbuck denied was Komondy's claim that Ronald Arnold denied Kormondy his right to effective assistance of counsel during the penalty phase of the case (after the Florida Supreme Court remanded the case in Kormondy I).  Arnold allegedly did this in two ways.  The first involved Kormondy's decision not to present mitigating evidence to the jury.  Kormondy alleged

> that his waiver of presentation of mitigation before the jury was at the recommendation of his Defense Counsel [and] that Defense Counsel could not advise the Defendant to make an intelligent and knowing waiver not to present mitigation before the jury since Defense Counsel had not: (1) investigated the Defendant's background, (2)

---

by God I was going to do a good job.

[28]  As support for his position that Stitt did not inform him of her relationship with the victim and that if she had done so, he would not have approved of her handling the case, Kormondy referred to letters he sent defense counsel and Judge Kuder, in which he sought the removal of the Assistant Public Defenders and the substitution of court-appointed attorneys from the private sector.  The Circuit Court found that Kormondy's requests for substitute counsel did not relate to the potential conflict Stitt had disclosed.

> Defendant's letter to trial counsel and Defendant's letter to the trial judge indicate that Defendant requested the Public Defender's Office be removed from his case because he wanted . . . counsel, like his codefendants'.  Defendant testified to this fact at evidentiary hearing as well.  Defendant has failed to submit any evidence which would convince the Court that he disapproved of his representation because of the[ ] potential conflict[ ].

58

read the entire file, (3) contacted or hired any experts, as no evaluations were performed, (4) contacted the Defendant's family or friends, (5) consulted with the Public Defender [Davis] regarding previous mitigation, nor (6) obtained any medical or school records of the Defendant.

. . . .

[H]ad Defense Counsel fully investigated and informed the Defendant of all potential mitigation, the Defendant would not have waived presentation to the jury.

The second way involved Arnold's performance post-verdict. Kormondy alleged that Arnold was ineffective in "failing to present record mitigation to the Court in his [Sentencing] Memorandum at the Spencer hearing [before the Court]."[29]

On June 30, 1999, a Spencer hearing was conducted . . . . At that hearing Defense Counsel was provided an opportunity to present mitigation, but failed to do so. In addition, Defense Counsel failed to provide to the Court record mitigation that had already been presented at the first penalty phase trial. Defendant's waiver to present mitigation to the jury does not constitute a waiver to present mitigation to the Court. Regardless of the waiver, the Court was obligated to consider all record evidence. Defense Counsel should have been aware of the requirement.

---

[29] A Spencer hearing occurs after the jury has recommended a sentence but before the judge imposes a sentence. Under Spencer v. State, the purpose of a Spencer hearing is to:

a) give the defendant, his counsel, and the State, an opportunity to be heard; b) afford, if appropriate, both the State and the defendant an opportunity to present additional evidence; c) allow both sides to comment on or rebut information in any presentence or medical report; and d) afford the defendant an opportunity to be heard in person.

615 So. 2d 688, 691 (Fla. 1993) (per curiam).

After considering the allegation that Arnold's investigation of mitigating evidence was constitutionally deficient and the testimony of Arnold, Kormondy, and Davis (who represented Kormondy in the penalty phase in 1994 until his discharge on Kormondy's motion on October 28, 1998), Judge Tarbuck said this:

> Raymond Arnold . . . was appointed to represent Defendant in his second penalty phase trial. Several types of mitigation evidence were presented at the first penalty phase trial. Attorney Arnold reviewed the mitigation evidence previously presented. Arnold testified that Defendant informed him he did not want the mitigation used in the first penalty phase presented in the second penalty phase trial.
>
> Arnold testified at the evidentiary hearing that he investigated possible mitigation evidence by speaking with Defendant, speaking with Defendant's mother on a number of occasions, speaking with an expert, and speaking with previous penalty phase counsel [Davis] about possible mitigation. Arnold further testified that Defendant told him he did not want any witnesses to be called to testify in mitigation and that he did not want mitigation about his previous drug and alcohol use presented.
>
> Contrary to Defendant's allegation, testimony was presented at the evidentiary hearing that [Arnold] actually discouraged Defendant from waiving all mitigation. Attorney Arnold testified that he encouraged Defendant to present mitigation evidence during the penalty phase. . . . [Arnold] even had his own daughter, who assisted [him] with investigating mitigation, speak to Defendant about presenting mitigating evidence. In the end, [Arnold] testified that there was 'so much bad' evidence that would have come in if Defendant had presented mitigation, that Defendant and [Arnold] agreed that it was good strategy not to present mitigation evidence. The Court finds that [Arnold] properly investigated possible mitigation before agreeing with Defendant that he should waive mitigation.

Based on these findings, Judge Tarbuck found Kormondy's waiver valid.

60

Turning to Arnold's allegedly deficient performance post-verdict, Judge

Tarbuck found that Arnold's Sentencing Memorandum and the attached

transcripts of Hazen's and Buffkin's testimony covered all the arguments Arnold

had made in favor of sentence mitigation and in pursuit of "counsel's primary

strategy that [Kormondy] was not the one who shot Mr. McAdams, to minimize

[Kormondy's] direct involvement, and to argue a death sentence . . . would be

disproportionate to the sentences received by [Kormondy's] co-defendants."

Turning to Kormondy's argument that Arnold should have presented the record of

mitigation evidence presented to the jury in the penalty phase of the 1994 trial,

Judge Tarbuck said this:

> Testimony at the evidentiary hearing was adduced that if
> [Arnold] had presented [that record] to the Court in his sentencing
> memorandum or at the Spencer hearing, that the cross-examination
> portion from the defenses witnesses would have also been before the
> Court for consideration.  At the evidentiary hearing it was revealed
> that this cross-examination testimony of defense witnesses would
> have included statements that Defendant was malingering or rather
> 'faking' any mental disturbance, that Defendant was accused of
> forcibly sodomizing and raping a man in the Santa Rosa County Jail,
> Defendant was a habitual user of crack cocaine, and committed
> crimes to get the drug over a period of time, Defendant had a lengthy
> criminal history that spanned many years, and that although
> Defendant was a product of a bad home life, Defendant's siblings
> (who grew up in the same environment) were upright citizens in the
> community.  This information was thought by [Arnold] not to impress
> a judge or a jury.  [Arnold] testified that he discussed the situation
> with Defendant on a number of occasions, and they agreed jointly that

61

it was good strategy not to present record mitigation. The reasoning for this decision was that if any of the favorable mitigators were argued, than the unfavorable information would also be before the Court.

. . . . [T]he Court finds that it was a strategic choice made by both counsel and Defendant not to present record mitigation to the Court for its consideration. Defendant is therefore not entitled to relief.

C.

As indicated above, Judge Tarbuck denied Kormondy's Rule 3.851 motion on June 20, 2005. Kormondy appealed his decision to the Florida Supreme Court, which affirmed, concluding that Judge Tarbuck, in disposing of Kormondy's ineffective assistance claims, properly applied the Strickland v. Washington standards to factual findings that had ample evidentiary support in the record. Kormondy v. State (Kormondy III), 983 So. 2d 418 (Fla. 2008).

IV.

On July 24, 2008, Kormondy petitioned the United States District Court for the Northern District of Florida for a writ of habeas corpus setting aside his 1994 convictions and the death sentence he received in 1999. His petition presented seven claims for relief, all rejected by the Florida Supreme Court. Three of the claims are before us in this appeal. Two of the claims, both alleging ineffective

62

assistance of counsel, were disposed of in Kormondy III, the other claim, alleging

a denial of the right of confrontation, was disposed of in Kormondy II. Since our

review is limited to these three claims, we omit discussion of the other claims

Kormondy's petition presented.

The first Kormondy III claim was that Stitt labored under a conflict of

interest in representing Kormondy during the guilt phase of the prosecution, in

1994. The second Kormondy III claim was that Arnold performed deficiently in

the penalty phase of the case, in 1998 and 1999. The Kormondy II claim was that

Judge Tarbuck, in sustaining the State's objection to a question Arnold asked

Cecilia McAdams on cross-examination, denied Kormondy his constitutional right

to confront her regarding her ability to identify the men involved in the charged

offenses.

The District Court's review of these claims was limited to the record before

the Florida Supreme Court when it decided the claims. Cullen v. Pinholster, 563

U.S. —, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011) ("We now hold that

review under § 2254(d)(1) is limited to the record that was before the state court

that adjudicated the claim on the merits."). This limitation is inherent in the

application of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L.

No. 104-132, 110 Stat. 1214 ("AEDPA"). Under AEDPA, a federal court may not

grant habeas relief on a claim previously adjudicated in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

The statutory phrase "clearly established Federal law" refers only to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000).  A state court decision is "contrary to" such holdings "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Id. at 412–13, 120 S. Ct. at 1523.  The "unreasonable application" clause of § 2254(d) permits a federal court to grant habeas relief "if the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413, 120 S. Ct. at 1523.  In sum, the District Court owed considerable deference to the Florida Supreme Court's decisions rejecting Kormondy's claims.

64

The District Court's review of the two claims rejected in Kormondy III concerned the Florida Supreme Court's application of the United States Supreme Court's holdings in Strickland v. Washington.  To make out a Sixth Amendment ineffective-assistance claim under Strickland, a petitioner must show (1) that counsel's performance was deficient and (2) that counsel's deficient performance prejudiced the defense.  446 U.S. at 687, 104 S. Ct. at 2064.  The performance prong is satisfied only if the petitioner "show[s] that counsel's representation fell below an objective standard of reasonableness."  Id. at 688, 104 S. Ct. at 2064.  Because "[t]here are countless ways to provide effective assistance in any given case," id. at 689, 104 S. Ct. at 2065, "the range of what might be a reasonable approach at trial must be broad," Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc).  Thus, "a petitioner must establish that no competent counsel would have taken the action that his counsel did take."  Chandler, 218 F.3d at 1315.  The prejudice prong requires the petitioner to establish a "reasonable probability" that, but for counsel's errors, the outcome at trial would have been different.  Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.

Both Strickland and AEDPA prescribe "highly deferential" review. Richter, — U.S. at —, 131 S. Ct. at 788 (quoting Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; Lindh v. Murphy, 521 U.S. 320, 333 n.7, 117 S. Ct. 2059, 2066 n.7, 138 L. Ed. 2d 481 (1997)) (internal quotation marks omitted). And where, as here, both apply, the "review is 'doubly' so." Id. (quoting Knowles v. Mirzayance, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420, 173 L. Ed. 2d 251 (2009)); see also Childers v. Floyd, 642 F.3d 953, 972 (11th Cir. 2011) (en banc) (observing that, because of the presumption under 28 U.S.C. § 2254(e)(1) that state court findings of fact are correct, "where factual findings underlie the state court's legal ruling, [the] already deferential review [under § 2254(d)] becomes doubly so"). Governed by these principles, the District Court addressed the ineffective assistance claims Kormondy III denied. The court began with the claim asserting Stitt's conflict of interest.

## A.

In his brief to the Florida Supreme Court in Kormondy III, Kormondy phrased his claim that Stitt labored under a constitutionally impermissible conflict of interest as he had presented it to Judge Tarbuck in his Rule 3.851 motion: "Whether . . . [Stitt] was . . . ineffective in failing . . . to withdraw from [Kormondy's] representation before the first trial." According to Kormondy, Stitt

66

"should have demanded her employer [the Public Defender for the First Judicial Circuit of Florida] remove her from [the] case, or, at the very least, inform the trial court about her conflict of interest on the record."

The crux of Kormandy's argument was that, under the United States Supreme Court's decision in Cuyler v. Sullivan, 446 U.S. 335, 349–50, 100 S. Ct. 1708, 1719, 64 L. Ed. 2d 333 (1980), Stitt "had an obligation to inform the Court, on the record, of any potential conflict of interest."  And not only did she have an obligation to state "on the record" the fact that she and the victim were high school classmates, "Judge Kuder was put on notice of a potential conflict by Stitt in chambers and failed to inquire of counsel on the record."

The Florida Supreme Court found no merit in Kormondy's conflict-of-interest claim because Kormondy failed to establish that Stitt "'actively represent[ed] conflicting interests.'"  Kormondy v. State (Kormondy III), 983 So. 2d 418, 434 (Fla. 2003).  The Florida Supreme Court indirectly addressed and rejected the argument that Cuyler v. Sullivan required it to find a prejudicial conflict in Kormondy's case by drawing on Cuyler's statement of what must be shown to establish a Sixth Amendment ineffective assistance claim based on a conflict of interest: "'"[Un]til a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate

67

for his claim of ineffective assistance.""" Id. (quoting Hunter v. State, 817 So. 2d 786, 792 (Fla. 2002) (quoting Cuyler, 446 U.S. at 350, 100 S. Ct. at 1719)). "'A possible, speculative or merely hypothetical conflict is "insufficient to impugn a criminal conviction."'" Id.

In his habeas petition to the District Court, Kormondy argued that the Florida Supreme Court's decision could not be sustained under 28 U.S.C. § 2254(d)(1) and (2), and that a writ of habeas corpus had to issue. The decision failed subpart (1), he said, because it "was contrary to, or involved an unreasonable application of, clearly established" Supreme Court precedent, namely Cuyler v. Sullivan; it failed subpart (2) because it was based on "an unreasonable determination of the facts." He contended that the decision was not supported by the evidence because, in passing on the claim, neither Judge Tarbuck nor the Florida Supreme Court considered all of the relevant evidence. The District Court was unpersuaded and therefore dismissed the claim that the Florida Supreme Court, applying Cuyler, should have found that Stitt had an impermissible conflict of interest and, for that reason, (1) had a constitutional duty to withdraw from the case, and (2) that her failure to do so prejudiced his defense as a matter of law. Kormondy v. Secretary, No. 3:08cv316-RH, slip op. at 44 (N.D. Fla. Sept. 29, 2011).

68

B.

As he did in briefing his claim against Stitt, Kormondy, in describing to the Florida Supreme Court his ineffective assistance claim against Arnold, phrased the claim as he had presented to Judge Tarbuck: (1) Kormondy's "waiver of presentation of mitigating evidence to the jury at the recommendation of his attorney was invalid because [Arnold] failed to investigate," and (2) "[Arnold] was ineffective for failing to present record mitigation to the Court in his [sentencing] memorandum and at the Spencer hearing." Kormondy argued that the Florida Supreme Court should reverse Judge Tarbuck's rulings on both aspects of his ineffective assistance claim, vacate his death sentence, and remand the case for a new sentencing proceeding before the jury because the rulings were based on facts that were clearly erroneous.

The Florida Supreme Court was not persuaded. Regarding Arnold's alleged failure to investigate, the court agreed with Judge Tarbuck that there was

> ample evidence that counsel did conduct a reasonable investigation and discussed all possible mitigation evidence with Kormondy, but Kormondy chose not to present any mitigation evidence. Kormondy was questioned by counsel and the trial court on the record whether he understood that he had a right to present mitigation evidence, and Kormondy replied that he understood that he had that right. Thus, Kormondy knowingly and voluntarily waived his right to present mitigation evidence.

69

Kormondy III, 983 So. 2d at 435–36.

As for the claim that Arnold performed deficiently post-verdict, the Florida Supreme Court held that the evidence at the Rule 3.851 hearing supported Judge Tarbuck's finding that Arnold decision not to present to the court at sentencing the record of the mitigation evidence Davis presented to the jury in 1994 was a sound strategic decision.  Id. at 436.  Arnold fully considered presenting such evidence, but, with Kormondy's assent, opted to forego such presentation due to the adverse information it would have yielded.  Id.

In his habeas petition to the District Court, Kormondy alleged that the provisions of 28 U.S.C. § 2254(d)(1) and (2) required the writ to issue.  Kormondy asserted that the Florida Supreme Court's decision regarding Arnold's performance was contrary to, or an unreasonable application of, Schiro v. Landrigan, 550 U.S. 465, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007).[30]  According to Kormondy, under Schiro,[31]

---

[30] The opinion in Schiro came down on May 14, 2007.  The opinion in Kormondy III bears the date October 11, 2007.  Kormondy did not cite Strickland v. Washington in support of his argument that the Florida Supreme Court's decision was contrary to, or an unreasonable application, of a United States Supreme Court holding.

[31] Kormondy's petition did not explicitly state that Shiro required the performance described in the quoted language.  We assume that, since Shiro was the only United States Supreme Court decision cited in support of the instant claim, that Shiro mandated the performance, as well as Farr v. State.

70

[e]ven if the alleged waiver was valid, Mr. Arnold was required to present available mitigation to the jury regardless of Kormondy's objection.  However, if Arnold was not ineffective for failing to present available mitigation to the jury, there was no excuse for not presenting the mitigation to the court.  Farr v. State, 621 So. 2d 1368 (Fla. 1993).

Kormondy asserted that the Florida Supreme Court's decision was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,"  28 U.S.C. § 2254(d)(2), because "the Florida Supreme Court either ignored the mitigation presented in the first trial, or totally misconstrued the argument regarding record mitigation," i.e., the transcript of the penalty phase of the 1994 trial before the jury.  "The Florida Supreme Court [also] failed to consider all relevant evidence by Mr. Arnold at the evidentiary hearing, as well as Mr. Kormondy's, about what mitigation Kormondy was waiving and the basis for the waiver."

The District Court was unpersuaded.  Without mentioning Schiro, the court held that Strickland v. Washington, which the Florida Supreme Court applied, controlled the decision.  Kormondy v. Secretary, No. 3:08cv316-RH, slip op. at 30.  Regarding Strickland's performance, the District Court found that "the record fully supports the Florida Supreme Court's conclusion that [Arnold] did not render ineffective assistance by failing to investigate or present mitigation evidence."  Id.,

71

slip op. at 32.  Addressing the argument that Arnold was ineffective in not presenting record mitigation post-verdict to the sentencing judge, the District Court concluded that the following testimony indicated he was not ineffective:

> [Arnold] testified in the state collateral proceeding that he and Mr. Kormondy were concerned that some of the possible mitigation evidence would do more harm than good.  An attorney reasonably considers this possibility.  See Kimbrough v. Sec'y, Dep't of Corr., 565 F.3d 796, 804 (11th Cir. 2009) (upholding as reasonable an attorney's decision not to present expert testimony based on a "concern that the limited beneficial information they might have been able to present would have been outweighed by the risk of opening the door to the admission of more damaging information.").  [Arnold] was concerned about the negative effect of evidence of drug and alcohol addiction.  And he was concerned that any testimony of the expert he contacted would be marred by the expert's conclusion that Mr. Kormondy was malingering and attempting to fake a mental or emotional condition.  The concern about a corresponding negative effect from any mitigation evidence drew support from the experience in the first penalty-phase trial; one of the attorneys from that trial said that "for every aspect of the mitigation that I got into it and opened the door, every witness that I called whether it be expert or lay person, it basically opened the door to your cross-examination and brought out some facts that were not—were actually not mitigating aspects."

Id., slip op. at 31.  Having concluded that this testimony resolved in the ineffectiveness issue, the District Court moved from Strickland's performance prong to its prejudice prong, and, concluded that Arnold's omission of the mitigation evidence Kormondy claims should have been submitted caused him no prejudice.

72

Nor has Mr. Kormondy shown prejudice from the failure to present mitigation evidence. On this record, there is no reasonable likelihood that mitigation evidence would have made a difference. See Burger v. Kemp, 483 U.S. 776, 788–95[, 107 S. Ct. 3114, 3122–3126, 97 L. Ed. 2d 638] (1987) (holding that when the available mitigation evidence would not have aided the petitioner's case, the attorney did not render ineffective assistance by failing to present the evidence); Grayson v. Thompson, 257 F.3d 1194, 1225 (11th Cir. 2001) (Even assuming arguendo ineffective assistance in the mitigating case at sentencing, there is no reasonable probability that the balance of aggravating and mitigating circumstances that led to the imposition of the death penalty in this case would have been different had counsel introduced the evidence compiled and presented in [petitioner's] state habeas proceedings.").

Id., slip op. at 32 (second alteration in original).

In sum, in the District Court's view, the evidence in the record fully supported the Florida Supreme Court's finding that "Kormondy knowingly and voluntarily waived the right to present mitigating evidence and that this was a strategic choice." Id., slip op. at 30. The District Court therefore concluded that "the Florida Supreme Court's rejection of this claim was not contrary to or an unreasonable application of federal law as determined by the United States Supreme Court, nor were the rulings based on an unreasonable determination of the facts in light of the evidence presented in the state court." Id., slip op. at 32–33.

73

C.

After disposing of Kormondy's ineffective assistance claims, the District

Court turned to the third claim now before us, which is based on the Sixth

Amendment's Confrontation Clause.  This claim arose during Arnold's cross-

examination of Cecilia McAdams during the penalty phase of the trial.  The

District Court's order denying habeas relief described the setting.

> At the penalty-phase retrial, Mrs. McAdams gave testimony consistent with this version of events.  Mr. Buffkin entered the home first—a point on which all apparently have agreed all along.  Mr. Hazen was the first to sexually assault Mrs. McAdams.  Mr. Hazen invited Mr. Kormondy to join the sexual assault, and he did.  Mr. Hazen and Mr. Kormondy returned to the kitchen with Mrs. McAdams, and then Mr. Buffkin took her to the back room and sexually assaulted her.  While Mr. Buffkin was in the back room with Mrs. McAdams, she heard a gunshot in the kitchen.

> [Arnold] cross-examined Mrs. McAdams, focusing at one point on her assertion that the third assailant—the one who was with her when the shot was fired—was the person who entered the home first. The cross-examination included this exchange:

> > Q.    [W]ith regards to the individual who last took you back to the bedroom, you indicated a few minutes ago, when you were testifying, that you thought the voice was the same as the first person.  Isn't it really true that you don't really know which one it was?

> > A.    No, sir. I feel very confident that I do know which one it was.

74

Q:    Do you remember back in March the 29th of 1994 when these cases first got started?

A.    Yes, sir.

Q.    And Mr. Edgar and several other attorneys were present when they took your deposition?

A.    Yes, sir.

Q.    Do you recall if – at that time, if you were asked with regard to the identity of the person who took you back?

MR. EDGAR: Your Honor, I object.

THE COURT: I sustain. Do not answer the question.

Q.    [Arnold] Mrs. McAdams, were you ever able to identify Johnny Shane Kormondy as being in your home?

A.    I did not see him as far as his full face, no, sir. I recognize some similar characteristics and features.

Q.    Because of the height, the weight, and that sort of thing?

A.    Hair.

Q.    And hair?

A.    Uh-huh.

75

> Q.    And would the same go with . . . Hazen, whatever his name was, did you ever – were you ever able to identify him?
>
> A.    No, sir.

Id., slip op. at 24–25 (second alteration in original).

In appealing his sentence to the Florida Supreme Court, Kormondy, relying on Delaware v. Van Arsdall, 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986),[32] argued that, in sustaining the prosecutor's objection to the question "Do you recall . . . if you were asked with regard to the identity of the person who took you back?", the trial court denied him his "constitutional right to cross-examine a witness when he attempted to impeach Mrs. McAdams'[s] testimony by questioning her about a prior inconsistent deposition statement." Kormondy II, 845 So. 2d at 52.  The Florida Supreme Court rejected the argument, adopting the State's argument instead.

> As the State argues, the defense made no attempt to establish through a proffer or other explanation that the trial court should not have sustained the State's objection.  The defense did not indicate what was being sought from the witness by the question nor that there was evidence that would demonstrate that Mrs. McAdams had misidentified her assailants.  See Finney v. State, 660 So. 2d 674, 684

---

[32]  Kormondy's brief cited Delaware v. Van Arsdall, 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986), in a string cite, but did not explain why the Florida Supreme Court should find trial court error based on those decisions.  Kormondy also cited within that string cite, "Olden v. Kentucky, 488 U.S. 227 (1988); United States v. Owens, 484 U.S. 554 (1988); . . . Davis v. Alaska, 415 U.S. 308 (1974); and California v. Green, 399 U.S. 149 (1970)."

76

(Fla. 1995) (holding that without a proffer it is impossible for the appellate court to determine whether the trial court's ruling was erroneous and if erroneous what effect the error may have had on the result). Therefore, it cannot be determined from the record that the defendant was deprived of his opportunity to cross-examine or impeach the witness.

Id. at 52–53.

The Florida Supreme Court cited no United Supreme Court case in rejecting Kormondy's constitutional argument. Rather, as the above quotation indicates, the Florida Supreme Court rejected his argument on a state law ground; after the trial court sustained the prosecutor's objection, defense counsel, to obtain appellate review of the ruling, had to inform the court of the answer he expected Mrs. McAdams to give. The District Court acknowledged that the Supreme Court had decided the issue as a question of Florida law, and held that it was a "proper ground," Kormondy v. Secretary, No. 3:08cv316-RH, slip op. at 26, "'a state law ground that is independent of the federal question and adequate to support the judgment,'" id. at 28 (quoting Coleman v. Thompson, 501 U.S. 722, 729–30, 111 S. Ct. 2546, 2553–54, 115 L. Ed. 2d 640 (1991)). At the same time, the District Court responded to Kormondy's argument that the Florida Supreme Court's decision was contrary to, or an unreasonable application of Van Arsdall, and concluded that "Van Arsdall does not hold that a trial court cannot require a

77

proffer or its equivalent as a condition for preserving a Confrontation Clause objection." Id. at 27.

## V.

The District Court denied Kormondy's petition for a writ of habeas corpus on July 24, 2008. He now appeals its decision. As was the situation in the District Court, we are tasked with determining whether the Supreme Court of Florida, in rejecting a claim at issue here, rendered a decision that was contrary to, or involved an unreasonable application of, a Supreme Court holding, or was based on an unreasonable determination of fact. And in carrying out that task, we, like the District Court, are limited to the record on which the Florida Supreme Court based its decision. Cullen, 563 U.S. at —, 131 S. Ct. at 1398. With that said, we turn to the three claims on review, taking them up in the same order the District Court did.

## A.

In his brief to this court, Kormondy frames the issue concerning Stitt's alleged conflict of interest and his argument on that issue, thusly: "Kormondy's Fifth, Sixth, and Fourteenth Amendment Rights were violated because he did not have conflict-free counsel." Appellant's Br. at 1, 47. That is not how he framed the issue in the Rule 3.851 court, the Florida Supreme Court, and the District

78

Court.  In those courts, he framed the issue as: "Whether [Stitt] was . . . ineffective in failing . . . to withdraw from [Kormondy's] representation before the first trial." Stitt was ineffective, Kormondy argued, because she and the victim had been high school classmates.

In framing the issue and the argument as he has done in this court, Kormondy is attempting to transform a series of defense counsel miscues, which, standing alone, could not support a constitutional claim, into a claim that the totality of the miscues worked a manifest injustice requiring a new trial.[33]  This claim of combined instances of ineffective assistance has not been exhausted, and we therefore do not consider it.  See 28 U.S.C. § 2254(b)–(c).  What we do consider is whether the District Court erred in concluding that there was no basis for finding that the Florida Supreme Court's decision somehow misapplied Cuyler v. Sullivan or that it was based on facts having no evidentiary support in the record.  The answer is no.  There is nothing in the record of this case indicating that, at the time Stitt undertook Kormondy's representation, she was "actively represent[ing] conflicting interests."  Kormondy III, 983 So. 2d at 434.

---

[33]  For example, Kormondy alleged that Stitt "conceded [his] guilt of robbery and burglary to the jury" without consulting him, "failed to impeach Mrs. McAdams with available evidence," including her own deposition, and "failed to impeach [Long] with his criminal record."

B.

In his brief on appeal, Kormondy frames the issue and argument concerning Arnold's alleged ineffectiveness in the penalty phase essentially as he did in the Rule 3.851 court, the Florida Supreme Court and the District Court: "Kormondy was denied the effective assistance of counsel at the resentencing proceeding due to counsel's failure to adequately investigate and introduce mitigating evidence." Appellant's Br. at 1, 22.  Kormondy asks that we reverse the District Court's decision rejecting this claim because the District Court erred in concluding that "'the record fully supports the Florida Supreme Court's conclusion that the penalty-phase-retrial attorney did not render ineffective assistance by failing to investigate or present mitigating evidence.'"  Id. at 34.  Kormondy asserts, moreover, that the Supreme Court's "decision was objectively unreasonable and its factual findings [were] rebutted by clear and convincing evidence."  Id.

The nub of Kormondy's argument, as he presented it to the District Court and does so in his brief to this court, is that the Florida Supreme Court should not have relied on, as Judge Tarbuck did, "Arnold's testimony that 'Kormondy and counsel agreed that it was a good strategic decision not to present certain record mitigation because of statements that could come out in cross-examination of defense witnesses.'"  Id. at 33 (quoting Kormondy III, 983 at 436).  Kormondy

80

testified that he disagreed with that strategy; he wanted Arnold to introduce the mitigation evidence presented at the 1994 penalty phase, "he just did not want his mother to testify." Id. at 38. "[C]ontrary to the state court's determination, no mitigation was presented to the jury because Arnold was either unprepared to do so or he had a faulty understanding as to what constitutes mitigation." Id. at 42. In short, Kormondy's position, as communicated to Arnold, was that he wanted Arnold to present to the jury the same mitigation testimony Davis presented to the jury in 1994 with the exception of his mother's testimony. This mitigation, if presented, would have been enhanced, his brief implies, with the testimony of Dr. Gary Jacobsen, a physician specializing in addiction,[34] id. at 26, of whose opinion Arnold was either unaware or negligently disregarded. Davis hired Dr. Jacobsen in 1998, while Davis was still representing Kormondy, and presumably would have had summoned Dr. Jacobsen to testify before the jury. "Dr. Jacobsen . . . examined Kormondy in August 1998, and he submitted an evaluation" which covered Kormondy's social history with a focus on his chemical addition to alcohol and an assortment of drugs. Id. at 27. In addition to detailing Kormondy's use of alcohol, which began at age 12 (or earlier), and a variety of other

---

[34] Dr. Jacobsen's specialty was the same as Dr. Donald G. Morton's, the addiction specialist who testified as a defense witness in the 1994 penalty phase. See supra part I.B.

81

chemicals—marijuana, sniffing gasoline, LSD and Mushrooms (hallucinogens),

amphetamines, cocaine and crack cocaine—Dr. Jacobsen described Kormondy's

drug use around the time of the McAdams murder, on July 11, 1993.  Id. at 27–32.

> Cocaine use on 7/10/93 included at least 2 times in the afternoon in the $40 - $60 range.  He doesn't know how many times he used on 7/10 because he had been trading stolen goods for cocaine for a few weeks and going to the dealer multiple times a day.  He does not know when he last used before the date of incident.  All of his money was going to buy cocaine, which caused arguing with his wife and they were not on the "right terms".  She would stay with her mom and dad for several days at a time and he might leave the house for a day or two at a time himself.  This was occurring for about 2 weeks prior to 7/10.  Curtis Bufkin [sic] was staying with them.  He knew Mr. Bufkin [sic] was an escapee.  In response to specific questioning he admits that after 7/11/93 he traded the gun for cocaine.  He knew that he needed to get rid of the gun so he thought he might as well trade it for cocaine and nobody would ever say where it came from.  After 7/11/93 he continued to use cocaine whenever he had the money or something to trade until he was arrested.

Id. at 30 (emphasis added).

Kormondy acknowledges that he expressly declined to present mitigation

evidence in two lengthy colloquies that took place in court (in the absence of the

jury) both immediately prior to the commencement of the trial of the penalty phase

and after the State rested its case.  His brief recalls his testimony at the Rule 3.851

evidentiary hearing before Judge Tarbuck, when he was questioned about the

answers he gave during those colloquies.  He "remember[ed] appearing in front of

Judge Tarbuck, but some of the questions [he could not] remember." Id. at 40.

His brief cites the following question and answer from the evidentiary hearing.

> Q. If you are saying you wanted mitigation to be presented during the second penalty phase, why did you agree to the waiver of what Mr. Arnold asked you about?
>
> A. I believe I was just taking his advice on it. He felt that what was best at the time, so I was going along with him and taking his advice on it. I didn't really —

Id.

The inferences Judge Tarbuck could have reasonably drawn from the questions Arnold put to Kormondy during these colloquies are (1) that Arnold was fully aware of the mitigating evidence Davis had presented to the jury at the trial of the penalty phase in 1994 and the mitigating evidence available at that moment, in May 1999, and (2) that Arnold and Kormondy had discussed such evidence at length and decided not to present it. Kormondy obviously had a vivid memory of the evidence because he was adamant that he did not want his mother to testify; he had observed how she had been humiliated. In sum, the record amply supports Judge Tarbuck's and the Florida Supreme Court's findings regarding Arnold's investigation of mitigating evidence, his preparation for the jury trial and post-verdict sentencing, and Kormondy's knowing and voluntary agreement with the strategy Arnold employed.

83

As for that strategy, at sentencing, Arnold had reasonable arguments in mitigation. First, the only evidence the State had to prove that Kormondy was the shooter was his "confession" to Long, after a night of drinking. Long admitted on cross-examination in the guilt phase of the trial, in 1994, that "he smoked fifty dollars worth of crack-cocaine and drank six pitchers of beer prior to Kormondy's revelation that night." Long, who had a criminal record and was on the run for probation violation, had every incentive to implicate Kormondy—so that the authorities might go easy on him when the probation revocation hearing rolled around. In addition, he was looking to split a $50,000 reward with Robarts. At the very least, the credibility of Long's testimony was problematic. Second, some evidence suggested that Hazen, not Kormondy, pulled the trigger. Hazen was the one who had been possessing the .38-caliber handgun which fired the fatal shot. Hazen found the gun while rummaging through the drawers in the master bedroom; he used the gun to force Cecilia McAdams into the bedroom for oral sex; he had the gun in his possession while she was performing oral sex and Kormondy was raping her; and after that ended, he still had the gun in his possession when he and Kormondy left the bedroom and returned to the kitchen. Finally, Hazen was in the kitchen when the shot was fired. Either he shot Gary McAdams or he gave the gun to Kormondy, and Kormondy did the shooting. In

84

the end, except for Long's testimony, who had the gun was never established.[35]  At the end of the day, Arnold had a good argument that Kormondy should not be the only one of the three to receive a death sentence.

Kormondy's brief implies that Arnold's strategy could have accommodated the mitigation evidence presented in the first penalty phase—that the two strategies were not inconsistent.  Arnold could raise doubt about Kormondy's status as the one who shot Gary McAdams and argue that, in light of the sentences Hazen and Buffkin received, Kormondy should receive a life sentence and, at the same time, argue that his life should be spared because of his impoverished upbringing and chemical addiction caused by years of alcohol and drug abuse as shown by the mitigating evidence.  There are two problems with this argument. First, if Dr. Jacobsen testified as he wrote in his evaluation, he would establish that Kormondy had the murder weapon and had to get rid of it, so he traded it for cocaine.  Second, "this is not a case where the weight of the aggravating circumstances or the evidence supporting them was weak."  Rutherford v. Crosby,

_____

[35]  Further, Hazen, Kormondy's close friend and quasi-cousin, was tried following Kormondy's trial.  The State wanted Kormondy, who would not be sentenced until October 7, 1994—long after Hazen's trial—to testify against Hazen and obtained an order from the judge presiding over Hazen's case, Judge Kuder, granting Kormondy use immunity.  When the State called Kormondy as a witness, however, he refused to testify, so the judge held him "in contempt of court."  Kormondy I, 703 So. 2d at 457.  The record does not tell us why Kormondy refused to testify.  We don't know whether Stitt and Davis advised him to testify; his testimony, if he identified Hazen as the trigger man, may have been of benefit at sentencing.

85

385 F.3d 1300, 1316 (11th Cir. 2004). And the evidence of Kormondy's extensive drug and alcohol addictive consumption is, "as we have repeatedly recognized . . . often a two-edged sword, that provides an independent basis for moral judgment by the jury." Suggs, 609 F.3d 1218, 1231 (11th Cir. 2010) (internal quotation marks and citations omitted); see also Pace v. McNeil, 556 F.3d 1211, 1224 (11th Cir. 2009) ("[P]resenting evidence of a defendant's drug addiction to a jury is often a 'two-edged sword': while providing a mitigating factor, such details may alienate the jury and offer little reason to lessen the sentence."); Grayson v. Thompson, 257 F.3d 1194, 1227 (11th Cir. 2001) (same); Thompkins v. Moore, 193 F.3d 1327, 1338 (11th Cir. 1999) (same); Rogers v. Zant, 13 F.3d 384, 388 (11th Cir. 1994) (same). The evidence of Kormondy's impoverished upbringing, lack of parenting, and a father who abandoned him is also problematic. Kormondy's half-siblings, Vernon Laura, and Bill, were brought up in the same environment of physical abuse, neglect and poverty, their fathers left their mother to fend for herself and her children, yet they emerged as law abiding citizens. The mitigating evidence now pressed by Kormondy has its obvious limitations.

We conclude that, given the "double" deference due the Florida Supreme Court's decision by Strickland v. Washington and AEDPA, the District Court's

decision rejecting Kormondy's claim of ineffective assistance on Arnold's part must be affirmed.

## C.

We turn now to the third claim on appeal, which challenges the Florida Supreme Court's holding that the trial court did not err in sustaining the State's objection to a question Arnold put to Cecilia McAdams on cross-examination. In his brief to the Florida Supreme Court, Kormondy framed the issue this way: "Whether Kormondy was denied his right to cross-examine and confront state witness Cecilia McAdams concerning her ability to identity and distinguish the perpetrators. In his brief to this court, Kormondy reframed the issue to: "[Whether] Kormondy was denied his right to cross-examine and confront his accuser in violation of the Fourth, Fifth, and Fourteenth Amendments." Appellant's Br. at 1, 17. Although, in the argument portion of his brief to this court, Kormondy cites Sixth Amendment Confrontation Clauses decisions in support of his claim, principally Delaware v. Van Arsdall,[36] id. at 20–22, and the District Court held that the Florida Supreme Court's decision was neither contrary to nor involved an unreasonable application of Van Arsdall, in framing his issue here Kormondy chose not to refer to the Confrontation Clause. He relies, instead,

---

[36] The other Confrontation Clause decisions Kormondy cites are cited in note 31, supra.

87

on the Fourth and Fifth Amendments and the Fourteenth Amendment simpliciter and, then, in arguing that the Florida Supreme Court erred in sustaining the trial court's evidentiary ruling, makes no mention of those Amendments.[37]  The technical question this mis-framing of the issue creates is whether we decide the case in accordance with the issue as framed, or ignore the mis-framing and decide the matter as presented in his argument.  Because the Florida Supreme Court recognized the claim as alleging a Confrontation Clause violation, but disposed of it on a state law ground, and the District Court as an alternative holding addressed the claim under the Confrontation Clause, we do likewise.

Kormondy argues that the District Court erred in finding no basis for disturbing Florida Supreme Court's disposition of Kormondy's claim.  We find no error.  The District Court correctly held that the Florida Supreme Court properly

---

[37]  To the extent that Kormondy's claim is based on the Fourth and Fifth Amendments, the claim is unexhausted.  Moreover, Kormondy cites no United States Supreme Court Fourth or Fifth Amendment holdings applicable in the context of the claim at issue.  As for the Fourteenth Amendment, Kormondy cites Chambers v. Mississippi, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), an application of the Due Process Clause of the Fourteenth Amendment.  In that case, Chambers, the petitioner, claimed that the Mississippi Supreme Court—in sustaining the trial court's denial of his request to have a witness, who had confessed and later retracted his confession to the murder of which Chambers had been charged, declared a hostile witness and preclusion of the testimony of witnesses to such confession on hearsay grounds—denied him a fundamentally fair trial in violation of the Due Process Clause of the Fourteenth Amendment.

In the case at hand, nowhere in his brief to the Florida Supreme Court, in his habeas petition to the District Court, or in his brief to this court did Kormondy argue that the trial court's challenged evidentiary ruling denied him a fundamentally fair trial before the jury in the second penalty phase proceeding.  We therefore do not consider the claim.

88

rejected the claim on an independent and adequate state law ground, <u>Kormondy v. Secretary</u>, No. 3:08cv316-RH, slip op. at 27–28, and we can take judicial notice of the proposition that courts uniformly require a cross-examiner to put a question to the witness and obtain an answer before confronting the witness with a previous inconsistent answer.  The court held, alternatively, on <u>de novo</u> review, that the Florida Supreme Court's decision was not contrary to, or an unreasonable application of, United States Supreme Court precedent, namely <u>Van Arsdall</u>.  <u>Id.</u>, slip op. at 27.  The District Court explained that there was no valid claim at all, much less one under the Confrontation Clause.  Here is the court's analysis:

> Mr. Kormondy asserts he should have been able to impeach Mrs. McAdams with her deposition testimony that she did not see the face of the man who brought her into the bedroom when her husband was shot.  But the court did not bar Mr. Kormondy's attorney from asking exactly that.  Mrs. McAdams testified on direct that she matched the voice of the third assailant with that of the person who entered the home first, not that she saw the third assailant.  She presumably would have said, if asked, that she did not see the third assailant's face.  She would properly have been impeached with deposition testimony that she did not see the third assailant's face only if she first testified at trial that she <u>did</u> see his face.  When the defense attorney attempted to jump straight to the deposition testimony, without first having elicited Mrs. McAdams's testimony on this point at the trial, the court sustained an objection.  Enforcing the rule that a witness cannot be impeached with deposition testimony unless it is inconsistent with the witness's testimony at trial does not violate the Confrontation Clause.

89

Id., slip op. at 25–26. We agree that the Florida Supreme Court properly rejected the claim on an adequate and independent state law ground and, alternatively, that the decision was neither contrary to, or an unreasonable application of, Van Arsdall.

## VI.

For the reasons stated in this opinion, the judgement of the District Court denying the writ of habeas corpus is

AFFIRMED